784 P.2d 992

**Lucy ROMERO, Plaintiff–Appellee and Cross–Appellant,**

v.

**MERVYN'S and Dennis Wolf, Defendants–Appellants and Cross–Appellees.**

**No. 18142.**

Supreme Court of New Mexico.

Dec. 19, 1989.

250

Gallagher & Casados, Michael T. Watkins, Albuquerque, for defendants-appellants and cross-appellees.

Janet Santillanes, Albuquerque, for plaintiff-appellee and cross-appellant.

OPINION

RANSOM, Justice.

This is an appeal by defendant Mervyn's from a verdict in favor of plaintiff Lucy Romero for $2,041 in compensatory and $25,000 in punitive damages on a breach of contract claim. Romero cross-appeals the failure of the court to award certain witness fees as costs. We affirm.

On November 23, 1984, Romero and two of her adult daughters were shopping in Mervyn's Department Store in Albuquerque. It was the day after Thanksgiving and the store was crowded with Christmas shoppers. As Romero and her daughters were descending on an escalator, another customer either intentionally or accidentally pushed her. She fell to her hands and knees, hitting her jaw as she fell. One of her daughters testified that a commotion ensued. When Romero reached the bottom of the escalator, a salesperson at a temporary station helped her to her feet and out of the path of other shoppers. Either this employee or a security guard watching from a two-way mirror summoned the store manager to the scene.

Dennis Wolf, the acting store manager, came in response to this call. His usual job as operations manager of the store entailed responsibility for directing and training employees. It was also his duty to investigate and gather information on incidents involving customer injuries on the premises. Wolf testified that he could tell Romero was in pain and asked her whether she needed a wheelchair or ambulance. Romero replied that she did not. Wolf also testified that Romero's daughters were "very upset, a little bit hysterical," and kept asking who would pay for their mother's medical expenses. Wolf himself, according to Romero's testimony, "seemed to be kind of nervous and in a hurry since the store was busy." According to testimony by Romero and her daughters, Wolf told them that Mervyn's would pay any medical expenses. Wolf testified that, pursuant to company policy, he only told Romero that Mervyn's would submit the claim to its insurer, who would make the decision

whether to pay any claims arising from the incident.

Immediately following this conversation, Romero's daughters helped their mother out of the store, brought the car around, and returned to their home in Santa Fe. The following Monday, Romero still was in pain and decided she should seek medical attention. She had another of her daughters, who lived in Albuquerque, call Mervyn's and confirm with Wolf his promise that Mervyn's would pay the expenses. She also asked him if any forms needed to be completed when her mother went to the doctor. He told her to come down to the store and pick up the necessary forms. When she did so, however, Wolf told her that he was out of the forms and then, according to her testimony, told her to go ahead and have her mother go to the doctor, and Mervyn's would pay the expenses. Wolf testified the "forms" in question were insurance claim forms. Romero's daughter confirmed that Wolf told her the forms were for the insurance company but insisted that Wolf reiterated the promise that Mervyn's would pay the bill.

■ Thereafter, Romero consulted a physician and underwent physical therapy. The cost of her treatment came to $2,041. Mervyn's, however, refused to pay the bills. Romero filed suit in Santa Fe District Court, alleging liability under theories of negligence and contract. She did not rely on a theory of promissory estoppel.[1] At the first trial, the court granted summary judgment to Mervyn's on the contract claim and the jury returned a verdict in favor of Mervyn's on the negligence claim. The court based summary judgment on the lack of actual or apparent authority on the part of Wolf to bind Mervyn's to a contract. On appeal, this Court affirmed the jury verdict but reversed the summary judgment, holding that the question of Wolf's authority posed a genuine issue of material fact for the jury to decide. Romero v. Mervyn's, 106 N.M. 389, 390, 744 P.2d 164, 165 (1987).

On remand, the jury found in favor of Romero on her contract claim, and awarded punitive damages. Mervyn's appeals, arguing the court erred: (1) in submitting the contract claim to the jury because there was no evidence of consideration for Wolf's alleged promise to pay Romero's medical expenses; (2) in failing to set aside the award of punitive damages absent evidence of ratification of Wolf's acts by Mervyn's; (3) in submitting the question of Wolf's actual or apparent authority to the jury; (4) in failing to grant Mervyn's motion for a directed verdict when the court granted a directed verdict in favor of Wolf; (5) in submitting the issue of punitive damages to the jury when there was no evidence of malice on the part of Mervyn's in refusing to pay Romero's medical bills, or in refusing to grant Mervyn's motions for judgment n.o.v. or for a new trial because the award of punitive damages was based on sympathy, passion, and prejudice; and (6) in admitting the medical bills from Romero's physician and Lovelace Clinic absent expert testimony that the bills were both reasonable and necessary for the injuries Romero suffered in the incident at Mervyn's.

*Issues (1) and (2) not properly preserved for appeal.* Without objection, the jury was instructed under SCRA 1986, 13–802 (Express contracts; definition) and 13–803 (Implied contracts; definition). Mervyn's asserts on appeal, however, that there was *no substantial evidence of consideration* either having been expressly stated or having been shown in the surrounding circumstances, as, for instance, by the parties' words and actions, what they wanted to accomplish, the way they dealt with each other, and how others in the same circumstances customarily deal or would deal. *See Trujillo v. Glen Falls Ins. Co.,* 88 N.M. 279, 540 P.2d 209 (1975) (mutual assent, necessary to formation of contract, may be manifested wholly or part-

---

**1.** Where there is no consideration for a promise, it may still be enforceable if the promisor reasonably could foresee that the promisee would rely on the promise and the promisee in fact suffers economic loss as a result of reasonable reliance. *See Eavenson v. Lewis Means, Inc.,* 105 N.M. 161, 730 P.2d 464 (1986); *Capo v. Century Ins. Co.,* 94 N.M. 373, 610 P.2d 1202 (1980).

ly by written or spoken words or by other acts or conduct).

Although the court improperly instructed the jury (without objection) that Mervyn's had the burden of proving its claim of no consideration for any promise, there was no further definition or reference to consideration in the instructions. Mervyn's had tendered and objected to the refusal of an instruction that "The mere fortuitous presence of circumstances that might constitute consideration for an agreement is not enough, but consideration, like every other element in a contract, must be bargained for by the parties, and their minds must meet upon the consideration which is to support a promise." *See Knoebel v. Chief Pontiac, Inc.,* 61 N.M. 53, 294 P.2d 625 (1956) (consideration, like every other element in contract, must be bargained for and agreed upon by the parties). Mervyn's did not object in the trial court that substantial evidence of consideration was lacking,[2] and does not renew on appeal its argument that it was error not to give the tendered instruction defining consideration.

Mervyn's also claims it was error to deny its motion for a directed verdict when there was no evidence of any consideration for the promise. However, the record on Mervyn's motion for a directed verdict is devoid of reference to absence of evidence of consideration. We conclude the consideration issue is not before us in this appeal. We similarly do not consider a *ratification* issue raised for the first time on appeal. *See Samedan Oil Corp. v. Neeld,* 91 N.M. 599, 577 P.2d 1245 (1978) (liability of principal for punitive damages for the acts of an agent requires proof of ratification, participation, or authorization); SCRA 1986, 13–1826.

(3) *Trial court correctly submitted issue of actual or apparent authority to jury.* The jury received instructions on actual authority (express or implied) and on apparent authority. In its motion for directed verdict, Mervyn's raised the issue of substantial evidence of actual authority. Mervyn's also objected there was no substantial evidence to support the submission of an instruction of apparent authority. We conclude the court did not err in instructing the jury on the issue of agency.

"Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to [the agent]." *Restatement (Second) of Agency* § 7 (1958). To warrant an instruction on the issue of Wolf's actual authority to enter into a contract with Romero, substantial evidence must have been introduced that such conduct lay within the scope of Wolf's employment.

Besides being liable for acts within the actual authority of an agent, a principal also is responsible for the acts of the agent when the principal has clothed the agent with the appearance of authority. *Chevron Oil Co. v. Sutton,* 85 N.M. 679, 682, 515 P.2d 1283, 1286 (1973). Romero's claim of apparent authority was based on Mervyn's alleged placement of Wolf in a position that would lead a reasonably prudent third party to believe Wolf possessed authority to bind Mervyn's in a contract to pay medical bills. While actual authority is determined in light of the principal's "manifestations of consent" to the agent, apparent authority arises from the principal's manifestations to third parties, *Restatement (Second) of Agency* § 8 (1958), and can be created by appointing a person to a position that carries with it generally recognized duties. *Id.* § 27 comment a.

We believe substantial evidence was presented on the issue of Wolf's actual authority. When Romero was hurt, Mervyn's other employees called for the "manager." Wolf was both acting manager and operations manager. When he appeared on the scene, the employees already present deferred to his handling of the situation. Mervyn's presented testimony that it was

---

2. Sufficiency of evidence to submit a case to a jury, or to support a verdict, cannot be raised on appeal unless the lack of substantial evidence on a material issue has been specifically called to the trial court's attention by, e.g., a motion for a directed verdict, objection to instructions, or a motion for j.n.o.v. *See Blacklock v. Fox,* 25 N.M. 391, 183 P. 402 (1919).

indeed part of Wolf's job to deal with customer injuries, that no one else at the store other than Wolf had such authority, and indeed that there was no one else to whom an injured customer could go. Pursuant to his duties, Wolf inquired whether Romero was hurt and gathered information concerning the accident. It was at this point, according to testimony, that the first promises were made.

■ Mervyn's argues there was no testimony from Wolf or another agent of Mervyn's to suggest that it lay within Wolf's actual authority to bind Mervyn's. Moreover, Mervyn's argues, the evidence supported Mervyn's allegation that store policy in fact prohibited employees from admitting responsibility for customer injuries. Neither of these points mandated a different verdict. The jury was not obliged to believe the testimony concerning store policy. In addition, an agent's actual authority need not be proved by direct testimony; it can be inferred from attending circumstances. *Jameson v. First Savings Bank & Trust Co.*, 40 N.M. 133, 138–39, 55 P.2d 743, 747 (1936).

■ Mervyn's also argues that Wolf's statements at the time of the accident should not be considered as evidence of his actual authority. Mervyn's theory is that the extrajudicial statements of an agent cannot be used to prove agency, and the admissions of an agent are not binding on the principal unless made within the scope of authority. True, but here it is uncontroverted that Wolf was the acting manager of the store. After prima facie proof of managerial agency, extrajudicial declarations of the agent are admissible and may be considered in determining the scope of the agent's authority. *See id.* The fact that Wolf made an offer to pay Romero's medical expenses could be considered as evidence of authority to make a contract.

■ We believe substantial evidence also supported an instruction on apparent authority. Mervyn's alleged policy prohibiting employees from admitting responsibility for customer injuries is not controlling because the existence of such a policy was not public knowledge. A third person who deals with an agent is not bound by any secret or private instructions given to the agent by the principal. *Chevron Oil Co. v. Sutton*, 85 N.M. at 682, 515 P.2d at 1286.

The focus of our inquiry, rather, is the existence of substantial evidence from which the jury could find that Mervyn's placed Wolf in such a position and clothed him with such indicia of authority as would lead a third party, such as Romero, reasonably to conclude Wolf had the authority to make the promise at issue. Given the circumstances surrounding the accident itself and the role Wolf played as an employee of Mervyn's upon arriving at the scene, the jury could have concluded that Mervyn's had placed Wolf in such a position.

■ (4) *Directed verdict in favor of Wolf did not require directed verdict in favor of Mervyn's.* Mervyn's argues that, under principles of *respondeat superior*, the granting of a directed verdict in favor of Wolf impelled the granting of a directed verdict in favor of Mervyn's. We disagree. Principles of *respondeat superior* apply when the claim is based in tort and the plaintiff alleges the employer is liable for the conduct of an employee because the employee was acting within the scope of employment. *See McCauley v. Ray*, 80 N.M. 171, 180, 453 P.2d 192, 201 (1968).

■ This case, by contrast, involved a contract claim. When an agent with the authority to do so negotiates a contract for a disclosed principal, the agent is not liable personally unless the agent expressly is made a party to the contract or the agent acts in a manner indicating an intent to be bound personally. *Roller v. Smith*, 88 N.M. 572, 544 P.2d 287 (Ct.App.), *cert. denied*, 89 N.M. 6, 546 P.2d 71 (1975). The issue of substantial evidence of authority has been discussed above. Because there was no evidence that Wolf ever said he *personally* would pay Romero's medical expenses, the directed verdict in favor of Wolf was appropriate. It did not, however, require a directed verdict in favor of Mervyn's.

(5) *Trial court acted correctly in instructing the jury on the issue of punitive*

damages and in denying j.n.o.v. or new trial. Over Mervyn's objection, the trial court submitted an instruction that the jury could find Mervyn's liable for punitive damages if it determined the acts of Mervyn's were "maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard of the Plaintiff's rights." See SCRA 1986, 13-1827.

■ Although Mervyn's agreed to the wording of the instruction, it nevertheless objected that there was no proof of any malicious or wanton conduct in this case. First, Mervyn's objection could be deemed to imply that the instructions on malicious or wanton conduct raised false issues when combined with the other words used to describe the nature of the alleged wrong for which punitive damages were sought, i.e., acts that were fraudulent, oppressive, or committed recklessly. When a party has submitted to the jury instructions providing alternative bases for relief, it is reversible error to submit any one alternative for which there is no substantial evidence. *Salinas v. John Deere Co., Inc.*, 103 N.M. 336, 707 P.2d 27 (Ct.App.1984), *cert. quashed*, 103 N.M. 287, 705 P.2d 1138 (1985).

After objecting to the absence of proof of any malicious or wanton conduct, however, Mervyn's also stated it did not believe *any* punitive damage instruction would be proper in such a situation. Thus, secondly, Mervyn's objection may be construed as an argument that malicious or wanton conduct is a prerequisite to punitive damages. We feel this argument raises important questions concerning the meaning and purpose of New Mexico's punitive damage rule when applied to contract cases. In the following two sections, therefore, we discuss these issues. We conclude our discussion on punitive damages with an examination of the evidence supporting an instruction of malice.

■ —*Malice, wantonness and punitive damages.* Our previous cases clearly establish that, in contract cases not involving insurance, punitive damages may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights. *Green Tree Acceptance, Inc. v. Layton*, 108 N.M. 171, 769 P.2d 84 (1989); *Hood v. Fulkerson*, 102 N.M. 677, 699 P.2d 608 (1985); *Loucks v. Albuquerque Nat'l Bank*, 76 N.M. 735, 418 P.2d 191 (1966); *Stewart v. Potter*, 44 N.M. 460, 104 P.2d 736 (1940). *Cf. Jessen v. National Excess Ins. Co.*, 108 N.M. 625, 776 P.2d 1244 (1989) (gross negligence or recklessness provides basis for recovery of punitive damages by insured against insurer on claim for breach of insurance contract); *United Nuclear Corp. v. Allendale Mutual Ins. Co.*, 103 N.M. 480, 485, 709 P.2d 649, 654 (1985) (bad faith refusal to pay proceeds due on insurance contract supports award of punitive damages).[3]

Each of the terms listed, standing alone, will support an award of punitive damages. *See Green Tree Acceptance*, 108 N.M. at 174, 769 P.2d at 87. In a literal sense, therefore, it is incorrect to argue that "malice" or "wantonness" are essential terms to the exclusion of, e.g., fraud or oppression. However, in the sense that malice and wantonness, interpreted broadly, suggest an absence either of a good faith reason or of an innocent mistake, they describe the conduct targeted by our punitive damages rule.

■ "Malice" as used in our punitive damages instruction does not imply "actual malice" or "malice in fact" in the sense of an intent to harm. *Galindo v. Western States Collection Co.*, 82 N.M. 149, 154, 477 P.2d 325, 330 (Ct.App.1970). Instead, malice, as defined in *Loucks*, means

the intentional doing of a wrongful act without just cause or excuse. This

---

**3.** We have allowed the award of punitive damages in insurance cases under a more relaxed standard in part because of the fiduciary obligations inhering in insurance relationships and because of concerns arising from the bargaining position typically occupied by the insured and

insurer. *See Chavez v. Chenoweth*, 89 N.M. 423, 430, 553 P.2d 703, 710 (Ct.App.1976) (relationship between insurer and insured imposes fiduciary obligation on insurer to deal with insured in good faith in matters pertaining to performance of insurance contract).

means that the defendant not only intended to do the act which is ascertained to be wrongful, but that he knew it was wrong when he did it.

76 N.M. at 747, 418 P.2d at 199. This definition is a broad one and undoubtedly encompasses situations that also connote "fraudulent" or "oppressive" conduct. The term "wanton," as used in our punitive damages instruction, suggests a similar quality of wrongfulness when the evidence demonstrates conduct committed without concern for the consequences, rather than intentionally, and connotes an "utter indifference to or conscious disregard for the rights of others." *See Curtiss v. Aetna Life Ins. Co.*, 90 N.M. 105, 108, 560 P.2d 169, 172 (Ct.App.), *cert. denied*, 90 N.M. 7, 558 P.2d 619 (1976).

Thus, these words broadly distinguish "wrongful" breaches of contract from those committed intentionally for legitimate business reasons or those that are the result of inadvertence. In this sense, it may be argued that "malice" or "wantonness" are prerequisites to punitive damages. Nonetheless, we remain convinced that the nuances distinguishing the terms "malice," "fraud," and "oppression" make it useful to retain these words as distinct standards to guide the jury's exercise of discretion in particular cases.

*—Purpose of punitive damages in contract cases.* Mervyn's argues, even taking the evidence in the light most favorable to Romero, "the only thing shown was that Mr. Wolf said Mervyn's would pay the bill and then refused to do so." Mervyn's argues this conduct does not demonstrate malice or wantonness and, unless we reverse the award of punitive damages, "every breach of contract, even if justified, will result in a claim for punitive damages."

As discussed below, we believe substantial evidence of malicious or wanton behavior was presented in this case. However, Mervyn's argument raises an important issue. Our rule on punitive damages never was intended to make punitive damages available for every intentional breach of a contract. Although our previous cases have articulated clearly the standard for awarding punitive damages, they have not discussed in general terms the purpose of awarding punitive damages in contract cases. Before discussing whether substantial evidence supported submission of the issue of punitive damages to the jury, we undertake such a discussion.

The proposition is often repeated that, in general, "the purpose of awarding [contract] damages is ... compensation and not punishment." *Restatement (Second) of Contracts* § 355 comment a (1981).[4] The Supreme Court of California explained its reluctance in contract cases to allow the award of tort damages, including punitive damages, as follows:

> [P]arties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated damages in the event of breach. They may not be permitted to disclaim the covenant of good faith but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured. In such contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations of the parties.

*Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 769, 686 P.2d 1158, 1167, 206 Cal.Rptr. 354, 362 (1984) (footnote omitted).[5]

---

**4.** Professor Corbin has noted, however, "The truth of such a statement turns on rather nice distinctions between compensation and punishment." 5 A. Corbin, *Corbin on Contracts* § 1077, at 437–38 (1964). Another commentator has lamented that "[t]he functional purposes of contract damages * * * are obscured by a thick overlay of judicial decisions and scholarly commentary which uncritically recite that the

object of damages in contract is solely [compensatory]." Sullivan, *Punitive Damages in the Law of Contract: The Reality and the Illusion of Legal Change*, 61 Minn.L.Rev. 207, 219 (1977).

**5.** Some scholars have advanced similar explanations. One commentator has suggested that extension of punitive damages, at least in commercial contracts, would unjustifiably introduce

The general rule limiting recovery in contract case to compensatory damages thus seems in part calculated to leave undisturbed the allocation of risks and benefits to which both parties have agreed. Such a policy readily is accommodated by awarding money damages, if the measure of damages is based on the justified expectations of the injured party under the contract. Moreover, in most commercial settings,

> [t]he fact that [compensatory] damages must be paid tends directly to the prevention of breaches of contract. It makes, therefore, for the security of business transactions and helps to make possible the vast structure of credit, upon which so large a part of our modern prosperity depends.

5 A. Corbin, *Corbin on Contracts* § 1002, at 34 (1964).

Notwithstanding the general exclusion of punitive damages from contract cases, however, exceptions long have been recognized. *See, e.g., Welborn v. Dixon,* 70 S.C. 108, 49 S.E. 232 (1904) (punitive damages allowed for fraudulent breach of contract); *Stewart v. Potter,* 44 N.M. 460, 104 P.2d 736 (1940) (same). Many courts have conceptualized the conduct necessary to afford recovery of punitive damages as consisting of an independent tort. *See, e.g., Bituminous Fire & Marine Ins. Co. v. Culligan Fyrprotexion, Inc.,* 437 N.E.2d 1360 (Ind.Ct.App.1982) (breach of contract may support an award of punitive damages when elements of fraud, malice, gross negligence, or oppression mingle in the controversy); *Consolidated Am. Life Ins. Co. v. Toche,* 410 So.2d 1303 (Miss.1982) (punitive damages available when breach attended by intentional wrong, insult, abuse, or such gross negligence as to consist of an independent tort); *see generally,* 1 J. Ghiardi and J. Kircher, *Punitive Damages Law and Practice* § 5.16 (1985); Sullivan, *Puni-*

*tive Damages in the Law of Contract: The Reality and the Illusion of Legal Change,* 61 Minn.L.Rev. 207, 236–40 (1977). Similarly, the text of Section 355 of the *Restatement (Second) of Contracts* recognizes an exception when "the conduct constituting the breach is also a tort for which punitive damages are recoverable."

Other jurisdictions, including California, have justified the award of punitive damages in terms of breach of the implied covenant of good faith and fair dealing, particularly in cases involving insurance contracts. *See Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 510 P.2d 1032, 108 Cal. Rptr. 480 (1973). "Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." *Seaman's Direct Buying Serv.,* 36 Cal.3d at 768, 686 P.2d at 1166, 206 Cal.Rptr. at 362.

We believe, regardless of whether conceptualized in terms of an independent tort, breach of the implied covenant of good faith, or, as in New Mexico, in terms of the quality of the conduct constituting the breach itself, the award of punitive damages in some cases serves important social ends. In *Seaman's Direct Buying Service,* the court held that tort remedies, including punitive damages, were recoverable against a party who attempted "to avoid all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense." 36 Cal.3d at 769–70, 686 P.2d at 1167, 206 Cal.Rptr. at 363. In justifying its position, the court noted:

> Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics. Acceptance of tort remedies in such a situation is not likely to intrude upon the reasonable expectations of the contracting parties.

*Id.* (citation omitted).[6]

uncertainty and confusion into business transactions. Simpson, *Punitive Damages for Breach of Contract,* 20 Ohio St.L.J. 284 (1959). Another has suggested that, because parties freely create

their contractual obligations, "unlike the commission of a tortious act, failure to discharge these self-imposed obligations does not inevita-

Overreaching, malicious, or wanton conduct such as targeted by our rule is inconsistent with legitimate business interests, violates community standards of decency, and tends to undermine the stability of expectations essential to contractual relationships. When this is the case, it is appropriate to allow the jury to determine whether "the public interest will be served by the deterrent effect punitive damages will have upon future conduct." *Jones v. Abriani*, 169 Ind.App. 556, 578, 350 N.E.2d 635, 649 (1976) (quoting, *Vernon Fire & Cas. Ins. Co. v. Sharp*, 264 Ind. 599, 608, 349 N.E.2d 173, 180 (1976)).

—*Substantial evidence supported instructions on malice and wanton conduct, denial of j.n.o.v. or new trial not error.* Contrary to Mervyn's argument, we do not believe the evidence demonstrated only that Wolf made a promise which subsequently he did not keep. Consistent with the definition of malice under *Loucks*, the trial court instructed the jury that malice denoted "the intentional doing of a wrongful act without just cause or excuse. This means * * * [Mervyn's] not only intended to do the act which is ascertained to be wrongful, but that it knew it was wrong when it did it." We note that, in closing argument to the jury, Romero's attorney contended Mervyn's made the promise to pay her client's medical bills in order to get her out of the store without causing a

disturbance, but had its "fingers crossed" and never intended to keep that promise.

The evidence reasonably could be viewed as indicating the promise was made because, on one of the busiest shopping days of the year, Wolf wanted to get the Romeros out of the store as quickly as reasonably possible without causing a scene. Mervyn's also presented evidence that Wolf's promise was inconsistent with the store's policy regarding customer injuries, and that Wolf subsequently took no action other than to submit the claim to Mervyn's insurer. This evidence reasonably supports the inference that Wolf entered into the contract simply to end his encounter with Romero and her daughters, without intending to follow through on the promise, and with knowledge that his employer thereafter would not perform.[7]

 We thus conclude the jury could have inferred knowledge on Wolf's part that his employer would not honor the contract with Romero, and thus that he acted with malice. This determination leads to the conclusion that the jury also could infer Wolf made the promise with a conscious disregard for whether his employer subsequently would perform, and thus that he acted recklessly with a wanton disregard for Romero's rights. We conclude substantial evidence supported the instructions on malicious or wanton conduct. Consequently, the denial of j.n.o.v. and of a new trial was well within the

bly violate objective standards of societal conduct." *Sullivan, supra* note 4, at 219.

6. There is insufficient evidence of the decision making process that led Mervyn's to refuse payment of Romero's medical expenses to warrant a conclusion that it was adopting a "stonewall" position, anticipating that the limited nature of Romero's claim would make it impractical for her to secure legal representation and take her claim to court. Mervyn's well may have believed in good faith that it possessed one or more valid defenses to the claim when it made the decision to litigate. While we have been willing to expose an insurer to punitive damages when it refuses to pay a claim for frivolous or unfounded reasons, *see United Nuclear*, 103 N.M. at 485, 709 P.2d at 654, the fiduciary obligations on which this relaxed standard is based here are lacking. We note, however, that punitive damages long have been recognized as

an appropriate remedy in situations in which exposure merely to compensatory damages is an inadequate deterrent to prevent such oppressive conduct. *See A. Corbin, supra,* note 4 § 1077. Although *we do not decide this issue in the present case,* logic suggests that punitive damages be available when a party has breached a contract believing the wronged party cannot afford to contest the matter in court.

7. Direct evidence of knowledge that an act was wrongful *is not necessary to establish malice. See Galindo,* 82 N.M. at 154, 477 P.2d at 330 (familiarity of defendant with collection claim procedures and his failure to disclose knowledge of plaintiffs' whereabouts permitted inference that he intentionally chose to post notice of a garnishment claim on courthouse bulletin board as *method of service* because he knew plaintiffs thereby would not receive actual notice).

discretion of the trial court. *See Cienfuegos v. Pacheco,* 56 N.M. 667, 248 P.2d 664 (1952). Furthermore, the amount of the award of punitive damages is not so plainly unrelated to the injury or actual damages, such as to raise a question of sympathy, passion and prejudice as a matter of law. *See Faubion v. Tucker,* 58 N.M. 303, 270 P.2d 713 (1954).

(6) *Admission of medical bills not error.* Mervyn's argues it was error to admit Romero's medical bills without testimony that the treatment received was reasonably necessary as a result of the injury, and that the resulting bills were reasonable in amount. *See Frei v. Brownlee,* 56 N.M. 677, 248 P.2d 671 (1952). Romero responds by pointing out: (1) Romero's physician testified at the first trial as to these issues; and (2) while Mervyn's made an objection to this testimony as it dealt with reasonableness in the amount of the Lovelace Bill, Mervyn's did not object as to the necessity of either bill. Romero argues the doctrine of judicial estoppel should prevent Mervyn's from maintaining on remand following appeal of the first trial that the bills were not necessary for the contract claim. *See Chapman v. Locke,* 63 N.M. 175, 315 P.2d 521 (1957). On the issue of reasonableness, Romero urges us to extend to the facts here present the principle from worker's compensation cases that proof of a bill from a doctor is prima facie proof of its reasonableness. *See, e.g., Pritchard v. Halliburton Servs.,* 104 N.M. 102, 717 P.2d 78 (Ct.App.), *cert. denied,* 103 N.M. 798, 715 P.2d 71 (1986).

In *Pritchard,* the court held that introduction of supplemental medical bills in a second hearing should be prima facie evidence of the reasonableness and necessity of those bills, so long as they relate to the same injury at issue in the prior hearing. Romero, rather than submitting supplemental bills, introduced the original bills themselves without again calling her physician as an expert witness to repeat testimony given at the first trial. As Romero pointed out to the trial court on remand, her claim is for breach of a promise to pay medical bills, not for damages due to the injury; thus, in seeking to establish the

extent of her bills, she is in a somewhat analogous position to an injured employee seeking reimbursement for medical expenses, rather than disability.

■■■ We do not decide, however, whether principles developed in worker compensation cases necessarily apply under circumstances such as those present here. We note that the sole objection made by Mervyn's to the introduction of the bills was foundational in nature, i.e., the medical bills could not be admitted without testimony that they were reasonable in amount and reasonably necessary. Mervyn's did not object that, absent such testimony, the jury lacked substantial evidence from which to fix the damages incurred by Mervyn's alleged breach of the contract. Under the circumstances, we believe the trial court properly took judicial notice of the testimony in the previous trial and, absent presentation of evidence by Mervyn's disputing the reasonableness and necessity of the bills, properly admitted those bills into evidence.

*Court's refusal to award plaintiff's requested witness fees was not error.* Romero argues the trial court abused its discretion in refusing to award witness fees arising from the testimony of Romero's physician in the first trial, and in fixing too low the amount to be paid the medical records keepers who testified at the second trial. We disagree.

■■■ Romero's physician testified only at the first trial, and Romero chose for economic reasons to forego his testimony at the second trial. The first trial ended in a verdict in favor of Mervyn's on the negligence claim, and Romero's physician's testimony was introduced as part of her evidence of damages as to that claim. *See* SCRA 1986, 1–054(E) (costs shall be awarded to prevailing party as a matter of course unless court otherwise directs). Under these circumstances, the trial court did not err in the second trial in refusing to award the cost of testimony in the losing effort at the first trial. *Cf. Mills v. Southwest Builders, Inc.* 70 N.M. 407, 374 P.2d 289 (1962) (when first trial ended as mistrial

and second trial resulted in verdict for plaintiff on the same issues, court did not err in awarding costs arising from first trial).

■ The trial court fixed the amount of the witness fees for the record keepers in accordance with the statute and regulations applicable at the time they testified. We find no merit in Romero's argument that we should give retroactive effect to subsequent changes in the law, or that we should fix the amount of witness fees in accordance with the law applicable at a time the claim first was filed rather than at the time of their testimony.

For the foregoing reasons, the judgment of the trial court is affirmed in its entirety.

IT IS SO ORDERED.

SOSA, C.J., and BACA, J., concur.