John S. **Pangelinan**,
Plaintiff/Appellee,

v.

Juliana L. **Itaman**, Magdalena L. Mettao, Emilia L. Saures, Maria L. Ilo, and Roman W. Lairope,
Defendants/Appellants.
Appeal No. 93-012
Civil Action No. 92-1076
March 21, 1994

---

[21] *Tenorio*, 1 N.M.I. at 9-10.

Submitted on Briefs December 9, 1993

Counsel for appellants: Antonio M. Atalig, Saipan.

Counsel for appellee: Randall T. Fennell, Saipan.

BEFORE: DELA CRUZ, Chief Justice, VILLA-GOMEZ, Justice, and CRUZ, Special Judge.

VILLAGOMEZ, Justice:

On April 20, 1986, Juliana L. Itaman and four other heirs of Vicente Uol (collectively "Itaman" or "defendants") entered into a "Land Contract" ("contract") with the appellee, John S. Pangelinan ("Pangelinan"). All five heirs signed the contract. A sixth heir, Adela W. Quitugua ("Adela"), did not sign the contract and is not a party to this action.[1] Uol's estate was probated between the time the contract was signed and the present action was filed in the Superior Court.

Prior to the signing of the contract, Itaman or her predecessor in interest had entered into a land exchange agreement with the government, and the government transferred less land to Itaman than agreed. Due to the difference between what the government actually transferred and what it promised to transfer, a "short exchange right"[2] arose in favor of Itaman.

Pursuant to the contract, the defendants were to transfer to Pangelinan 16,378 square meters ("m²") of their short exchange claim[3] in exchange for 16,378 m² of Pangelinan's land (Lot E.A. 222) in Papago, Saipan ("Papago property"). The contract provided that Pangelinan would negotiate with the Marianas Public Land Corporation (MPLC) regarding which public land would be given to Uol's heirs as compensation for the short exchange.

Pangelinan subsequently negotiated and reached an agreement pursuant to which MPLC would convey 16,378 m² of land situated at Obyan, Saipan, as compensation to Itaman for the short exchange. Pangelinan then asked Itaman to execute with MPLC the documents necessary to effectuate the conveyance of the Obyan property to the Uol heirs as compensation for the short exchange. Itaman refused and questioned the validity of the contract. She asserted that because Pangelinan never physically showed Itaman his Papago property, she was excused from performing. The contract, however, contains no provision requiring Pangelinan to show the property to Itaman.

On September 10, 1992, Pangelinan filed suit against Itaman, seeking specific performance under the contract. He also sought actual and punitive damages, based on Itaman's alleged fraudulent misrepresentation as to who were Uol's rightful heirs.

The trial court found that the Papago property was Pangelinan's "family land" when he entered into the contract with Itaman, but that Pangelinan's wife, Merced, held record title to the property.[4] The court also found that Merced knew of the contract with Itaman, was willing to transfer title in accordance with the agreement, and was holding title to the property as trustee for Pangelinan. On August 29, 1992, Merced purportedly reconveyed title to Pangelinan by quitclaim deed.

The trial court concluded that the contract was valid and enforceable, and that Itaman failed to provide a valid reason that excused her from performing. The court further concluded that Itaman knowingly, fraudulently, outrageously, and willfully misrepresented to Pangelinan that Uol had only five heirs.[5] Itaman timely appealed.

We vacate and remand on the issues of whether the parties entered into a valid, enforceable contract and whether Pangelinan is entitled to have specific performance,[6] and reverse as to the award of punitive damages and attorney's fees.

## ISSUES AND STANDARD OF REVIEW

Itaman frames two issues for our review:
1. Whether the trial court erred in ruling that Pangelinan conveyed any title to the Papago property

---

[1] Whether Itaman knew, at the time of the execution of the contract, that Adela was an heir is an issue related to the punitive damages award discussed below.

[2] See Apatang v. Marianas Pub. Land Corp., 1 N.M.I. 140, 143 n.1 (1989); see also 2 CMC § 4141 et seq. (Public Purpose Land Exchange Authorization Act of 1987).

[3] This claim would be against the Marianas Public Land Corporation (MPLC), which, under Commonwealth law, manages and disposes of public lands on behalf of the government and people of the Commonwealth. See N.M.I. Const. art. XI, §§ 3-5; 2 CMC § 4111 et seq.

[4] As further discussed below, record title seems to have been held by Pangelinan and his children, and not by Merced. Neither the trial court nor the parties noticed this discrepancy. The parties addressed this issue for the first time on appeal after this Court brought it to their attention.

[5] The court also concluded that since Adela did not sign the contract, she could be bound by it. Additionally, the court determined that, on August 10, 1987, the appellant Roman W. Lairope entered into a separate agreement to sell his interest under the contract to Pangelinan. Finally, the trial court held that the contract should be reformed to carry out the intent of the parties. The parties did not appeal these findings.

[6] The trial court held that the contract should be reformed and then performed. On appeal, Itaman does not specifically contest the holding regarding reformation of the contract, and we do not address that issue here.

when Pangelinan entered into the contract on April 20, 1986.

2. Whether the trial court erred in awarding a judgment of $10,000 in punitive damages against Itaman, et al.

■ We note that the trial court did not rule, as Itaman seems to suggest in her statement of the first issue, that Pangelinan conveyed title to the Papago property on April 20, 1986. Rather, the trial court held that "the Land Contract dated April 20, 1986 is a valid, enforceable contract."[7] Thus, the first issue actually is whether the trial court erroneously concluded that the contract of April 20, 1986, is valid and specifically enforceable. Whether the contract is valid is a mixed question of law and fact which we review de novo.[8] However, since the trial court's interpretation of the contract included a review of extrinsic evidence of related facts, we review the application of contract law under the de novo standard, and the findings of fact under the clearly erroneous standard.[9]

■ The decree of specific performance is an equitable remedy. We review the trial court's exercise of its equitable powers under the abuse of discretion standard.[10] This standard of review also applies to the trial court's award of punitive damages[11] and attorney's fees.

## ANALYSIS

### A. The Enforceability of the Contract

Itaman suggests that the trial court found that Pangelinan conveyed title to the Papago property when he executed the contract. This was not the case. The court concluded that "the Land Contract dated April 20, 1986 is a valid, enforceable contract,"[12] and that Pangelinan was entitled to specific performance. As to this issue, we vacate and remand the case for further findings.

■ The trial court found that title to the Papago property "in effect" was held in trust for Pangelinan by his wife.[13] This finding is contrary to the evidence and is clearly erroneous.[14] The trial court and counsel either did not read or misinterpreted the deed of gift executed by Pangelinan in 1984 as having transferred title to the Papago property to Merced. The deed actually appears to transfer an interest in the property to the children of Merced and John Pangelinan. The deed provides, in part:

I, JOHN S. PANGELINAN, for and in consideration of natural love and affection I have unto *my children* by my wife, MERCED B. PANGELINAN, and for *their* support . . . do hereby give, remise, release and quitclaim *unto them*, subject to the estate reserved and the special limitation expressed hereunder, all of my right, title and interest [in the Papago property] . . . .

. . . .

RESERVING, however, unto myself, for the life of their grandfather, DIONICIO M. BABAUTA, a life estate in the property herein conveyed.

TO HAVE AND TO HOLD the same, so long as my mother, ROSALIA S. PANGELINAN, shall survive me . . . *thereafter unto my said*

[7] *See* Conclusions of Law ¶ 1. *Pangelinan v. Itaman*, Civ. No. 92-1076 (N.M.I. Super. Ct. Feb. 2, 1993) (Findings of Fact, Conclusions of Law, and Order).

[8] *Trinity Ventures, Inc. v. Guerrero*, 1 N.M.I. 54, 59-60 (1990).

[9] *See L.K. Comstock & Co. v. United Eng'rs & Constructors, Inc.*, 880 F.2d 219, 221 (9th Cir. 1989).

[10] *Rosario v. Quan*, 3 N.M.I. 269, 280 (1992) (citing *Hemlani v. Villagomez*, 1 CR 203, 208 (D.N.M.I. App. Div. 1981)).

[11] See RESTATEMENT (SECOND) OF TORTS § 908 cmt. d (1979) (whether to award punitive damages is within the sound discretion of the trier of fact); *Bouman v. Block*, 940 F.2d 1211, 1234 (9th Cir.) (trial judge has discretion to award punitive damages), *cert. denied*, 502 U.S. ___, 112 S. Ct. 640, 116 L. Ed. 2d 658 (1991).

[12] Conclusions of Law, *supra* note 7, ¶ 1.

[13] Findings of Fact, *supra* note 7, ¶ 5.

[14] Due to this error, the issue of whether Merced held the property in trust for Pangelinan when the parties entered into the contract becomes moot.

117

*children*, their heirs and assigns, *forever*, otherwise all herein conveyed shall revert back to me or to my heirs or assigns.[15]

Notwithstanding Pangelinan's misconstruction of his own deed, above, he maintains on appeal that he has fee simple title to the Papago property at present.[16] In support of this argument he improperly tenders to us evidence of Rosalia S. Pangelinan's death, which he neither introduced nor offered at trial. It is inappropriate for us to consider evidence not admitted below.[17]

Itaman disagrees with Pangelinan's interpretation of his deed. She asserts that Pangelinan's children hold title to the property.[18] This interpretation, on the face of the deed, is not untenable.

The language of the deed is ambiguous and raises important factual and legal questions that the trial court must address first. For example, the habendum clause ordinarily names the grantee (in this case, the children), but here it appears to relate to both the grantee and the grantor. It is unclear whether Pangelinan's life estate ends at his mother's death or the death of the children's grandfather. These mixed factual and legal issues should be resolved by the trial court. Until these questions are addressed, neither the trial court nor we can determine whether Pangelinan himself is capable of performing, so as to require Itaman also to perform.

## B. The $10,000 in Punitive Damages and Attorney's Fees

Itaman asserts that punitive damages should not have been awarded by the trial court. We agree and reverse the award.

■ Under the abuse of discretion standard we may reverse the trial court if its decision is based on a clearly erroneous finding of material fact, or if it did not apply the correct law.[19] Our review of the whole record leads us to conclude that the trial court committed clear error when it found that Itaman's failure to identify Adela as a sixth heir of Uol constituted fraud.

In his complaint, Pangelinan pleaded a cause of action for fraud. He alleged, inter alia, that "[t]he defendants, and each of them, made the representation to [Pangelinan] that they were the sole heirs of Vicente Uol in a deliberate attempt to defraud plaintiff."[20]

The trial court found that "[d]efendants knowingly and fraudulently misrepresented to plaintiff that they were the only heirs of . . . Uol."[21] The court then concluded that Itaman's "conduct was fraudulent, outrageous, knowing and willful in not disclosing the existence of an additional heir, [and Pangelinan] is entitled to punitive damages and attorney's fees. *As well as a contract violation, this conduct constitutes the tort of fraudulent misrepresentation.*"[22] The court did not award compensatory damages to Pangelinan. However, to reflect the absence of Adela's short exchange rights, the court reformed the contract by reducing the amounts of short exchange land and Papago property to be transferred by Itaman and Pangelinan, respectively. The court also awarded $10,000 in punitive damages, and attorney's fees, to Pangelinan.

In support of her argument that the trial court erred in awarding punitive damages, Itaman asserts that punitive damages cannot be awarded in an action for breach of contract. Itaman also asserts that even if punitive damages can be awarded in contract actions, the record lacks sufficient evidence on which to base a finding of fraudulent misrepresentation. We find only the second assertion to be persuasive.

■ We turn to the RESTATEMENT (SECOND) OF CONTRACTS (1981) ("RESTATEMENT OF CONTRACTS") for authority, because we have no written or local customary law on this issue.[23]

■ RESTATEMENT OF CONTRACTS § 355 specifies that a plaintiff may not recover punitive damages for

---

[15] John S. Pangelinan, Deed of Gift (signed Apr. 23, 1984), *in* Appellants' Supplemental Excerpts of Record at ER-2 (emphasis added).

[16] Brief of Appellee (Supplemental) at 4.

[17] *See* 1 CMC § 3103 (expressly proscribing the taking of new or additional evidence by the Supreme Court in appellate matters).

[18] Appellants' Supplemental Brief at 3.

[19] *See United States v. Plainbull*, 957 F.2d 724, 725 (9th Cir. 1992); *Lucky Dev. Co., Ltd. v. Tokai, U.S.A., Inc.*, 3 N.M.I. 79, 84 (1992).

[20] Complaint at 3, ¶ 13, *Pangelinan v. Itaman*, Civ. No. 92-1076 (N.M.I. Super. Ct. filed Sept. 10, 1992).

[21] Findings of Fact, *supra* note 7, ¶ 10.

[22] Conclusions of Law, *supra* note 7, ¶ 10 (emphasis added).

[23] *See* 7 CMC § 3401.

breach of contract "unless the conduct constituting the breach is also a tort for which punitive damages are recoverable."[24] In other words, the breaching party's act must not only be a breach of contract, but must also amount to an independent, intentional tort.[25]

Under § 355, therefore, the trial court in the present case could properly have awarded punitive damages, even if the award stemmed from Itaman's breach of the contract, as long as the court correctly found that Itaman's failure to disclose Adela's existence constituted an independent, intentional tort. We hold that the trial court erred in concluding, under the facts presented, that Itaman committed the tort of fraudulent misrepresentation.

██ As authority for its holding that Itaman's failure to reveal Adela's existence constituted the tort of fraudulent misrepresentation, justifying an award of punitive damages, the trial court cited RESTATEMENT (SECOND) OF TORTS ["RESTATEMENT OF TORTS"] §§ 526 (1977) and 908 (1979).[26] Section 908 addresses the purpose of, and criteria for, making punitive damages awards.[27]

Under this section, if there has been no evil motive or reckless indifference, it is error for the trier of fact to award punitive damages.[28]

RESTATEMENT OF TORTS § 526 provides:

A misrepresentation is fraudulent if the maker[:]
    (a) knows that the matter is not as he represents it to be,
    (b) does not have the confidence in the accuracy of his representation that he states or implies, or
    (c) knows that he does not have the basis for his representation that he states or implies.[29]

Read together, §§ 908 and 526 prescribe the elements which must be present to support an award of punitive damages in this case. Specifically, Itaman's conduct must: (1) have constituted the tort of fraudulent misrepresentation, and (2) have been outrageous, either due to evil motive or reckless indifference. We discuss these in turn.

The contract Itaman signed includes the following provision: "The undersigned subscribing in [sic] behalf of the heirs of Vicente Uol hereby warrant that they are the sole and legal heirs of Vicente Uol and none other."[30] The parties do not disagree that because Adela is an heir, this provision of the contract constitutes a misrepresentation. However, Itaman asserts that the misrepresentation was not made fraudulently and does not merit an award of punitive damages. We agree.

---

[24] RESTATEMENT (SECOND) OF CONTRACTS § 355 (1981). The Restatement emphasizes that the purpose of awarding damages in contract actions is to compensate the injured party, and not to punish the breaching party. *See id.* cmt. a. By providing, nevertheless, for the award of punitive damages in limited circumstances in contract actions, the Restatement's position is consistent with the proposition that punitive damages serve the public interest by discouraging malicious, wanton, and overreaching conduct by a breaching party. *See Romero v. Mervyn's*, 784 P.2d 992, 1000-01 (N.M. 1989).

[25] *See, e.g., id.,* 784 P.2d at 1000; *McIntosh v. Magna Sys., Inc.*, 539 F. Supp. 1185, 1190 (N.D. Ill. 1982) (both cases discussing, inter alia, RESTATEMENT (SECOND) OF CONTRACTS § 355 (1981)); *see also* 5 Arthur L. Corbin, CORBIN ON CONTRACTS § 1077 (1964 & Supp. 1991) (punitive damages become viable in a contract action if defendant's wrong is characterizable as intentionally tortious or grossly negligent).

[26] Conclusions of Law, *supra* note 7, ¶ 10.

[27] This section provides:

(1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.

(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier or

fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

RESTATEMENT (SECOND) OF TORTS § 908 (1979).

[28] *See id.* cmt. d.

[29] RESTATEMENT (SECOND) OF TORTS § 526 (1977). We note that additional elements, set forth in other sections of the Restatement, must be proved to create liability under § 526. *See id.* § 526 cmts. a and b. However, we do not address these additional elements, because we hold that none of the conditions set forth in § 526 itself have been established. *Cf. Rogolofoi v. Guerrero*, 2 N.M.I. 468, 476-77 (1992) (discussing the elements of fraudulent misrepresentation under RESTATEMENT (SECOND) OF CONTRACTS § 162(1) (1981)).

[30] Land Contract at 1 (signed Apr. 20, 1986) *in* Appellants' Supplemental Excerpts of Record at ER-1.

■ Itaman misrepresented a conclusion of law in stating that the defendants were the sole "heirs" of Uol.[31] This misrepresentation became clear only when proceedings were initiated to probate Uol's estate, and it was determined that Adela, a half-sister, was an heir.

The defendants are not lawyers, and they were not represented by counsel at the time they executed the contract. Moreover, at the time the parties entered into the contract, Uol's estate had not been probated. The defendants, therefore, did not have the benefit of a court determination to support their statement that only the five of them were Uol's heirs. Itaman's statement was, in effect, a statement of opinion and belief, not a statement of fact.

Pangelinan is fluent and literate in English. He drafted the contract and used the term "heirs" after questioning the defendants as to whether they had any other "brothers" or "sisters." The defendants, in contrast, required the assistance of a translator to testify at trial, evincing their lack of fluency in English.[32]

■ It is only after an heirship determination by a court that one may safely identify all of a decedent's heirs, including the unknown heirs who might exist. Here, the evidence as a whole fails to show that the defendants possessed superior knowledge about the matter of heirship at the time they represented that they were Uol's only heirs.

■ Our review of the record indicates that the trial court clearly erred in finding that the misrepresentation was fraudulently made.[33] The record lacks sufficient evidence to establish that any of the three conditions described in RESTATEMENT OF TORTS § 526 existed here, i.e., that when Itaman entered into the contract, she either (1) knew or believed that the matter of heirship was not as she represented, or (2) doubted the accuracy of her representation about heirship, or (3) knowingly stated or implied that her representation was based on a legal determination of heirship.

■ Finally, nothing in the record shows that Itaman misrepresented the matter of heirship to Pangelinan with the reckless indifference or evil motive necessary to support an award of punitive damages. The defendants maintain that they believed in good faith that they were Uol's only heirs, because Adela never lived with them and was only a half-sister. Documents introduced at trial also indicate that Adela was not considered part of the family for purposes of previous transactions involving family land.

We hold that the trial court abused its discretion in awarding punitive damages for Itaman's breach of contract.[34]

## CONCLUSION

For the above reasons, we **REVERSE** the judgment awarding attorney's fees and punitive damages against Itaman, **VACATE** the decree of specific performance and **REMAND** the case for the trial court to redetermine: (1) what interest, if any, Pangelinan conveyed, and to whom, in the deed of gift dated April 23, 1984, and (2) whether Pangelinan still has, or has reacquired, ownership of the Papago property.

---

[31] The question as to who is an heir of a decedent is strictly a question of law. *In re Estate of Dela Cruz*, 2 N.M.I. 1, 8 n.4; *see also* 8 CMC § 2202(a) (conferring jurisdiction upon Commonwealth trial court over probate matters, including determination of heirs).

[32] *See* Transcript at 36-116.

[33] The trier of fact determines whether fraud has been proved by clear and convincing evidence. *Anderson-Blake, Inc. v. Los Caballeros*, 818 P.2d 775, 781 (Idaho Ct. App. 1991); *see also In re Estate of Rofag*, 2 N.M.I. 18, 31 (1991). That determination will not be reversed on appeal unless it is clearly erroneous. Com. R. Civ. P. 52(a). A determination of clear error will be made where the appellate court, reviewing all the evidence, finds support for the finding but is left with a definite and firm conviction that a mistake has been made. *Rogolofoi*, 2 N.M.I. at 476 (quoting *Rofag*, 2 N.M.I. at 31).

[34] Our holding reverses the award of all damages, including attorney's fees, based on the trial court's erroneous finding of fraudulent misrepresentation.