1997-NMCA-097

946 P.2d 1108

**Patricia W. ABEITA, Individually and as the Widow and Personal Representative of the Estate of Jose I. Abeita, Deceased, and as the natural mother and next friend of Amy Abeita, Catherine Abeita, and Maureen Abeita, minors, and Jacklyn Bitsie, as the natural mother and next friend of Meredith Abeita, a minor, Plaintiffs–Appellees/Cross–Appellants,**

**v.**

**NORTHERN RIO ARRIBA ELECTRIC COOPERATIVE, a New Mexico Corporation, Defendant–Appellant/Cross–Appellee.**

**No. 17088.**

Court of Appeals of New Mexico.

Aug. 15, 1997.

Brian K. Branch, Daniel R. Swiss, the Branch Law Firm, Albuquerque, and David C. Chavez, the Law Firm of David Chavez, Los Lunas, for Appellees/Cross–Appellants.

Gregory V. Pelton, Pelton & O'Brien, P.A., Albuquerque, for Appellant/Cross–Appellee.

*OPINION*

HARTZ, Judge.

(1) Northern Rio Arriba Electric Cooperative (NORA) appeals from a judgment against it arising from the death of Plaintiffs' decedent, Jose Abeita. Abeita was electrocuted while completing construction work on the home of Thurman and Jolene Velarde. The jury awarded compensatory damages—apportioning fault 60% to NORA, 30% to Abeita, and 10% to Mr. Velarde—and punitive damages. The district court held that NORA was jointly and severally liable for Mr. Velarde's fault. Plaintiffs cross-appeal, seeking prejudgment interest. We hold that NORA is liable only for its own 60% fault, but we affirm on all other grounds.

FACTS

(2) In October 1992 the Velardes hired Sun Arrow Construction to build a garage attachment to their mobile home in Dulce,

New Mexico, on the Jicarilla Apache Indian Reservation. Abeita owned Sun Arrow. Mr. Velarde designed the garage and chose the location—under a power line owned and maintained by NORA. The Velardes did not inform NORA of the impending construction of the garage, nor did they seek NORA's consent to locate the garage under the power line.

(3) NORA first learned of the project on the evening of October 20, 1992, when a pole-mounted transformer on the Velardes' property failed. Two employees of NORA who came to fix the transformer noticed that a newly poured concrete slab extended underneath the power line. When the employees questioned Mrs. Velarde about the slab, she told them that it was the foundation for a garage that was being built. The employees advised her to delay further construction because of the danger posed by working in close proximity to the power line. They further informed her that the line would be moved and that someone from NORA would contact the Velardes to arrange for the relocation.

(4) The next day two NORA employees, Charlie Vance and Johnny Ulibarri, visited the Velardes' property to determine how to relocate the power line. Because the Velardes were not at home, Vance and Ulibarri left a note on the door advising them not to allow construction to proceed until the line had been relocated. Mrs. Velarde found the note and conveyed the message by telephone to Mr. Velarde, who was in Denver, Colorado.

(5) After returning from his trip, Mr. Velarde called Vance on October 23. During their telephone conversation they discussed the need for tribal approval to relocate the power line and the time frame within which such approval could be obtained. Vance told Mr. Velarde that the proposal would be submitted to the tribe on October 27.

(6) On October 24 Abeita and his construction crew began framing the garage. Mr. Velarde passed on Vance's request not to start construction until the line had been moved, but Abeita proceeded.

(7) The proposal to relocate the line was submitted to the tribe on October 27 and approved the same day. According to Mr. Velarde, he contacted Vance that day to ascertain the status of the proposal and informed Vance that construction was continuing and the garage was practically complete. Vance testified that he had no recollection of such a conversation.

(8) In the early afternoon of October 28, Vance again visited the Velardes' residence. The testimony is in conflict as to what occurred during this visit. Vance testified that he informed Abeita that the line carried 14,-400 volts, that he was crazy to be working in such close proximity to it, and that he should cease construction until the line was moved, but Abeita ignored his warnings and walked away from him. Members of the construction crew told a different story. They testified that Vance was flippant, that he merely laughed at them, and that he never told them the voltage on the power line. There is no dispute that Vance left the construction site without taking any steps to de-energize the line or to halt construction. Instead, he went to Mr. Velarde's office and again informed him of the importance of moving the lines and halting construction until this was done. Vance testified that he obtained a promise from Mr. Velarde that he would go to the site and halt construction, but Mr. Velarde testified that he made no such promise. Vance did nothing further to address the danger at the Velarde residence.

(9) That evening the garage was substantially complete. Abeita went on the roof to sweep off debris with a metal-handled broom. While he was sweeping, he was fatally electrocuted when the handle came into contact with the line, which was approximately five feet four inches above the level of the roof.

DISCUSSION

(10) NORA contends that the district court erred in the following rulings: (1) holding NORA jointly and severally liable for the fault apportioned to Mr. Velarde; (2) instructing the jury on negligence per se; (3) failing to instruct the jury with respect to the

comparative negligence of Mrs. Velarde; * (4) refusing to give NORA's tendered instruction regarding the duty to warn; (5) failing to set aside the jury's percentage allocation of fault; (6) failing to set aside the award of punitive damages; and (7) failing to grant a mistrial after a witness mentioned that NORA carried insurance. Plaintiffs cross-appeal, contending that the district court improperly refused to grant prejudgment interest. We affirm on all grounds except the imposition of joint and several liability upon NORA for the fault of Mr. Velarde.

## I. Joint and Several Liability

■ (11) The jury apportioned 60% of fault to NORA, 30% to Abeita, and 10% to Mr. Velarde. The district court held NORA jointly and severally liable for Mr. Velarde's 10% share. NORA argues that it is liable only for its 60% share. We agree.

(12) New Mexico has abolished joint and several liability for most tort cases. NMSA 1978, § 41–3A–1 (Repl.Pamp.1996). The only exceptions are set forth in Section 41–3A–1(C), which states:

> The doctrine imposing joint and several liability shall apply:
> (1) to any person or persons who acted with the intention of inflicting injury or damage;
> (2) to any persons whose relationship to each other would make one person vicariously liable for the acts of the other, but only to that portion of the total liability attributed to those persons;
> (3) to any persons strictly liable for the manufacture and sale of a defective product, but only to that portion of the total liability attributed to those persons; or
> (4) to situations not covered by any of the foregoing and having a sound basis in public policy.

Both the district court and Plaintiffs' brief on appeal have relied on Section 41–3A–1(C)(4) and *Saiz v. Belen School District*, 113 N.M. 387, 827 P.2d 102 (1992).

(13) In *Saiz* the defendant school district had employed an independent contractor to install a lighting system on a high school football field. The contractor failed to install the system properly, resulting in the electrocution of a boy. The district court held that the school district was not liable for any negligence on the part of its independent contractor and should be liable only for its proportionate fault for negligent maintenance of the system. 113 N.M. at 391, 827 P.2d at 106. The Supreme Court disagreed, holding on public policy grounds that the school district (if it had not been immune under the state Tort Claims Act) would be jointly and severally liable with the independent contractor under Section 41–3A–1(C)(4). 113 N.M. at 400, 827 P.2d at 115. The Supreme Court ruled that the school district had a nondelegable duty to take necessary precautions in installing the lighting system. The duty could not be avoided by having an independent contractor perform the work. The Court said that "when precautions are not taken against inherent danger, the employer is jointly and severally liable for harm apportioned to any independent contractor for failure to take precautions reasonably necessary to prevent injury to third parties arising from the peculiar risk." *Id.*

(14) In contrast, NORA had not hired an independent contractor to perform any of the work on its lines, with respect either to de-energizing or moving them. On its face, therefore, *Saiz* would seem to be inapplicable to this case. The district court, however, interpreted *Saiz* to hold that NORA had a non-delegable duty to make sure the lines posed no threat to the construction workers. The court apparently reasoned that constructing and maintaining electrical lines was an inherently dangerous activity, that NORA had a duty to protect the public from the dangers posed by this activity, that such duty was nondelegable, and that NORA had attempted to delegate this duty to Mr. Velarde by making him responsible for halting construction. Similarly, Plaintiffs argue on appeal that "[i]f an electric utility is not per-

---

* The portion of the filed opinion addressing this issue is not included in the published opinion, by order of the Court of Appeals on rehearing.

mitted under the law to delegate its responsibility to a trained independent contractor, it is inconceivable that it would be allowed to shift blame to an untrained homeowner."

(15) We are unpersuaded. To be sure, NORA may have had some nondelegable duties with respect to safety at the construction site. In the circumstances here, we assume that it had a duty to warn Abeita of the danger and a duty to turn off the power when Abeita did not heed the warnings. If NORA had assigned those duties to a non-employee agent, it would likely be liable for the agent's failure to perform those duties. But NORA had no duty—either delegable or nondelegable—to halt construction. *Saiz* does not impose duties to do the impossible. NORA had no authority to halt construction. The Sun Arrow crew was not employed by NORA, was not doing any work on NORA's line, was not working on land owned by NORA, and neither reported to nor was responsible to anyone at NORA. Therefore, NORA should not be liable for the negligent failure of another person to halt construction.

(16) Furthermore, the jury may have based its finding of negligence against Mr. Velarde not only on his failure to halt construction on the garage but also on his failure to inform NORA about the planned addition before any construction commenced or on his design and placement of the garage. Such negligence would clearly not constitute any breach of duty by NORA.

(17) Under these circumstances, the district court erred in imposing joint and several liability on NORA for Mr. Velarde's negligence. The judgment must be modified accordingly, so that NORA is liable only for the 60% of fault apportioned to it.

II. Negligence–Per–Se Instruction

(18) On appeal NORA challenges the district court's instruction on negligence per se. Instruction 17 stated:

There were rules and regulations in force in this state, at the time of the occurrence in question, which provided that:

1) All electric supply lines and equipment shall be maintained so as to reduce hazards to life so far as practicable.

2) To promote safety to the general public and to employees not authorized to approach current carrying parts of electric supply lines, the current carrying parts shall be arranged to [sic] as to provide adequate clearance from the ground or any other space generally accessible, or shall be provided by [sic] guards so as to isolate them effectively from accidental contact by such persons.

3) All open supply lines and wires carrying between 750 volts and 15,000 volts crossing over driveways to residents' garages or roads in urban or rural districts shall, at a minimum be 20 feet above the ground.

4) All open supply lines and wires carrying between 750 volts and 15,000 volts over spaces or ways accessible to pedestrians only shall, at a minimum be 15 feet above the ground.

5) All unguarded or accessible supply conductors carrying voltages between 8700 volts and 15,000 volts, with a span of 0 to 150 feet, shall at a minimum be 8 feet above any building which they cross.

If you find from the evidence that Northern Rio Arriba Electric Cooperative violated any of these rules and regulations, then [NORA]'s conduct constitutes negligence as a matter of law.

NORA does not dispute that the instruction accurately recites regulations in effect in New Mexico at the time of the accident. Nor does it suggest on appeal that the regulations should be treated differently from statutes for the purpose of instructing the jury on negligence per se. *See* UJI 13–1501 NMRA 1996, Directions for Use; Restatement (Second) of Torts § 288B (1965). What NORA does contend is that the instruction was erroneous because (1) two of the regulations were too general to form the basis of a negligence-per-se instruction and (2) there was insufficient evidence to support a verdict that the other regulations were violated. We find no reversible error.

### a. Paragraph 1

**(19)** With respect to Paragraph 1 of the instruction, NORA complains that the word "practicable" is insufficiently precise to form the basis of a negligence-per-se instruction. The issue appears to be one of first impression in New Mexico.

(20) Our Supreme Court has adopted the following test for determining whether a negligence-per-se instruction is appropriate:

> (1) [T]here must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent.

*Archibeque v. Homrich,* 88 N.M. 527, 532, 543 P.2d 820, 825 (1975). NORA contends that paragraph 1 fails the first prong of this test because it does not set forth a sufficiently specific standard of conduct.

(21) There is substantial authority for the proposition that a negligence-per-se instruction is appropriate only if the statute or regulation defines the duty with specificity. In *Swoboda v. Brown,* 129 Ohio St. 512, 196 N.E. 274, 278–79 (Ohio 1935), the court wrote:

> Where a specific requirement is made by statute and an absolute duty thereby imposed, no inquiry is to be made whether the defendant acted as a reasonably prudent man, or was in the exercise of ordinary care.... But, where duties are undefined, or defined only in abstract or general terms, leaving to the jury the ascertainment and determination of reasonableness and correctness of acts and conduct under the proven conditions and circumstances, the phrase "negligence per se" has no application.

*Accord Eisenhuth v. Moneyhon,* 161 Ohio St. 367, 119 N.E.2d 440, 444 (1954); *Board of*

*Comm'rs v. Klepinger,* 149 Ind.App. 377, 273 N.E.2d 109, 112 (1971); *see, e.g., Dahle v. Atlantic Richfield Co.,* 725 P.2d 1069, 1073 (Alaska 1986) ("In order for a provision to be the basis of a negligence per se instruction, it must set forth a specific standard of conduct beyond that defined in a common law duty."); *Griffith v. Valley of the Sun Recovery & Adjustment Bureau,* 126 Ariz. 227, 613 P.2d 1283, 1285 (App.1980) ("[N]egligence per se applies when there has been a violation of a *specific* requirement of a law or an ordinance."); *Fagerquist v. Western Sun Aviation,* 191 Cal.App.3d 709, 236 Cal.Rptr. 633, 639–40 (1987) ("[D]octrine of negligence per se is not applicable unless the statute, rule or ordinance ... sets forth a specific standard of conduct."); *Sego v. Mains,* 41 Colo.App. 1, 578 P.2d 1069, 1071 (1978) ("[I]t is an essential element of negligence per se that the statute prescribe or proscribe specific conduct on the part of the alleged tort-feasor."); *see generally* W. Page Keeton et al, *Prosser and Keeton on the Law of Torts* § 36 (5th ed. 1984).

**(22)** By that standard, paragraph 1 of the instruction may well be improper. NORA's complaint below was that the term "practicable" is too general because it just means "reasonable." *See Lester v. John R. Jurgensen Co.,* 400 F.2d 393, 396 (6th Cir. 1968). We agree that if "practicable" means "reasonable," [1] then paragraph 1 of the instruction merely restated the common-law standard and was unnecessary. *But see Martel v. Montana Power Co.,* 231 Mont. 96, 752 P.2d 140, 145 (1988) (holding, without analysis of specificity requirement, that regulation using word "practical" or "practicable" was appropriate for negligence-per-se instruction).

(23) But an unnecessary instruction does not necessarily create reversible error. If "practicable" means "reasonable," then NORA was not prejudiced by paragraph 1 because it merely told the jury that it should find NORA negligent if it failed to act rea-

---

1. We need not decide whether "practicable" means something other than "reasonable," because that possibility was not raised below by NORA. *See Woolwine v. Furr's, Inc.,* 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987) ("To

preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court.").

sonably—the common-law standard. *See Cobb v. Coleman,* 94 Ga.App. 86, 93 S.E.2d 801, 804 (1956) (although instructing jury based on negligence per se would be inappropriate based on statute incorporating reasonableness standard, "the jury would necessarily have had to find that the defendant was guilty of common law negligence in order to find that the violation of those sections was negligence per se, and having found the defendant negligent at common law, it was immaterial whether the negligence was negligence per se or not"); *Deering v. Carter,* 92 Ariz. 329, 376 P.2d 857, 860 (1962) (en banc) (no prejudicial error); *Hinnant v. Holland,* 92 N.C.App. 142, 374 S.E.2d 152, 155 (1988) (same). Therefore, giving paragraph 1 of the instruction did not create reversible error.

### b. Paragraph 2

█ (24) Paragraph 2 of the instruction states:

> To promote safety to the general public and to employees not authorized to approach current carrying parts of electric supply lines, the current carrying parts shall be arranged to [sic] as to provide adequate clearance from the ground or any other space generally accessible, or shall be provided by [sic] guards so as to isolate them effectively from accidental contact by such persons.

NORA raises two arguments on appeal with respect to paragraph 2. First, it argues that the paragraph was inapplicable because the district court had already determined that (1) the roof of the garage was not generally accessible and (2) the regulation was not intended to protect contractors like Sun Arrow. But NORA failed to raise this argument below. Therefore, we will not consider it on appeal. *See* Rule 12–216(A); *Martinez v. Teague,* 96 N.M. 446, 450, 631 P.2d 1314, 1318 (Ct.App.1981) (court will not consider objection to instruction when argument on appeal is not the same as argument raised below).

█ (25) NORA's second argument is similar to the one it raised with respect to paragraph 1. It contends that paragraph 2 is too general for a negligence-per-se instruction. When we examine NORA's argument

before the district court, however, we conclude that it did not point to any defect that would create reversible error. As we understand NORA's argument during the settling of instructions, it complained that paragraph 2 was insufficiently specific for a negligence-per-se instruction because it spoke only in terms of providing "adequate clearance." NORA may well be correct that such language is too general for a negligence-per-se instruction. But immediately after pointing to this generality in paragraph 2, counsel for NORA said: "[T]hen [other paragraphs of the instruction] come in and tell you what those clearances are in particular applications like our case. And that's where I think where you should be getting into negligence per se, is when there is something specific that somebody could look at and say you didn't comply." The district court could properly conclude from this comment that even if paragraph 2 taken by itself would be impermissibly vague, the vagueness in the term "adequate clearance" was resolved by the remaining paragraphs of the instruction, which set forth specific minimum clearances in certain situations. In other words, paragraph 2 would simply serve the purpose of introducing the later paragraphs of the instruction. We therefore fail to see any prejudicial error arising from the use of the term "adequate clearance" in paragraph 2.

### c. Paragraphs 3, 4, and 5

█ (26) NORA does not contend that paragraphs 3, 4, or 5 were too general for a negligence-per-se instruction. Rather, it argues that either they were not supported by sufficient evidence or the deceased was not of the class of persons the regulations sought to protect.

(27) Again, however, these objections were not raised at trial. On the contrary, counsel appeared to state that these paragraphs were appropriately included in the instruction. For example, counsel stated:

> What's case specific is when you get down to [paragraph 3], where they have their positions, and we have our positions. And if the court wants to instruct them on what their position is, if you find this was a public road, then the clearances are 20 feet

. . . That's specific. *And that's what the Court, I think, should instruct the jury on with reference to clearances.* (Emphasis supplied.)

Later, as previously noted, counsel added that these paragraphs "come in and tell you what those clearances are in particular applications like our case. And that's where I think where you should be getting into negligence per se, is when there is something specific that somebody could look at and say you didn't comply." Having failed to object to these paragraphs below, NORA cannot now complain. *See Gerety v. Demers,* 86 N.M. 141, 142–43, 520 P.2d 869, 870–71 (1974) (party may not challenge correctness of instruction to which it took no exception below); *Hinger v. Parker & Parsley Pet. Co.,* 120 N.M. 430, 440, 902 P.2d 1033, 1043 (Ct. App.) (party may not raise for first time on appeal the argument that there was insufficient evidence to support instruction), *cert. denied,* 120 N.M. 213, 900 P.2d 962 (1995); *Blacker v. U–Haul Co.,* 113 N.M. 542, 546, 828 P.2d 975, 979 (Ct.App.1992) (party may not raise objection to instruction which was not made to trial court); *cf. Romero v. Mervyn's,* 109 N.M. 249, 253 n. 2, 784 P.2d 992, 996 n. 2 (1989) (challenge to sufficiency of evidence must be raised in trial court).

### III. The Duty to Warn

■ (28) NORA contends that the district court committed reversible error by refusing to give a proposed jury instruction that consisted of the following quotation from *Koenig v. Perez,* 104 N.M. 664, 667, 726 P.2d 341, 344 (1986): "The law requires . . . warnings for the unwary—not for those who have knowledge of a dangerous condition and choose to ignore the ordinary precautions necessary to protect themselves." *Id.* (quoting *Curd v. H.B. Zachry Co.,* 72 N.M. 427, 429, 384 P.2d 695, 697 (1963)). NORA asserts that a party is entitled to an instruction stating its theory of the case and that one of its theories of the case was that it had no duty to warn Abeita because he already knew of the danger.

■ (29) We assume that NORA had no duty to warn Abeita if Abeita had full knowledge of the danger and NORA knew that Abeita had such knowledge. Also, we agree that a party is entitled to an instruction stating its theory of the case. There remains, however, the question of how much detail there must be in the instructions. The preface to New Mexico's uniform jury instructions contains a section entitled "The Concept of Jury Instructions," which includes the following sentence: "Many 'pattern' instructions have been omitted from this publication, not because the point should not be made to the jury, but because it should be made to the jury by counsel rather than by the court." UJI NMRA 1996, at 3. In keeping with this philosophy, our uniform jury instructions on negligence are short and general. *See, e.g.,* UJI 13–1601 NMRA 1996 (defining "negligence"); UJI 13–1603 NMRA 1996 (defining "ordinary care"); UJI 13–1604 NMRA 1996 (stating the duty to use ordinary care). In particular, we note that the uniform jury instructions setting forth the duties of owners and occupiers of land contain only one sentence regarding the duty owed to a visitor: "An [owner] [occupant] owes a visitor the duty to use ordinary care to keep the premises safe for use by the visitor [, whether or not a dangerous condition is obvious]." UJI 13–1309 NMRA 1996 (Supp. June 1996) (brackets in original). There is no longer any counterpart to the former uniform jury instruction which set forth specifically when the owner or occupant owes a licensee a duty to warn. *See* UJI 13–1308 NMRA 1996.[2] *But cf.* UJI 13–1313 NMRA 1996 (landlord need not warn tenant against obvious defect).

---

**2.** The former UJI 13–1308 NMRA 1996 stated:

An [owner] [occupant] owes a duty to a licensee if, and only if:

(1) [He] [She] knows or has reason to know of a condition of [his] [her] land involving an unreasonable risk of harm to the licensee; and

(2) [He] [She] should reasonably expect that the licensee will not discover or realize the danger.

In such case, [he] [she] has a duty to make the condition safe or to warn the licensee of the condition and risk involved; however, if the licensee knew or had reason to know of the condition, the [owner] [occupant] has no duty to warn.

(30) We infer that our Supreme Court as a general rule would determine that the better practice is simply to instruct the jury that a party owed a duty of ordinary care and then leave to counsel to argue what ordinary care required in the circumstances. That is the approach taken by the district court in this case. At trial NORA denied that it had failed to exercise ordinary care. NORA's counsel was entitled to argue that ordinary care does not require one to issue warnings to someone who already knows the pertinent information. We find no abuse of discretion by the district court in leaving it to counsel to make this point. *See Behrmann v. Phototron Corp.,* 110 N.M. 323, 326, 795 P.2d 1015, 1018 (1990) (giving instruction was not abuse of discretion).

## IV. Allocation of Fault

(31) NORA contends that the jury's allocation of fault was not supported by substantial evidence. It argues that Abeita was well aware of the dangers involved in working around high-voltage electrical lines, that he was specifically informed of the warnings given by NORA's employees regarding the commencement of construction before the line was moved, and that the jury was properly instructed on all these points. Based on the evidence of Abeita's negligence, NORA concludes that "[f]or the jury to find [NORA] twice as much at fault as Abeita is not supported by substantial evidence and is not the kind of verdict this Court should condone."

(32) We disagree. All that is required for affirmance is that there be substantial evidence supporting the jury's apportionment of fault. *See Marcus v. Cortese,* 98 N.M. 414, 416, 649 P.2d 482, 484 (Ct.App. 1982). Although NORA claims that Abeita was more negligent than Vance because he ignored Vance's warning that he was "looking to get killed" if he continued to work near the power lines, exactly what Vance said to Abeita was hotly disputed at trial. There was evidence that Vance failed to warn Abeita of the exceptionally high voltage of the power line and of the actual risks posed by working near it. There was further evidence that Vance's attitude at the time was flippant and that therefore none of the construction

crew took his warnings very seriously or thought it was dangerous to proceed with the work.

(33) Also, Plaintiffs argued below that Vance should have taken steps to de-energize the line when he saw that his directive to halt construction was being ignored. At trial Ulibarri testified that de-energization was a quick process. From his testimony the jury could have inferred that even if Vance did not have the tools to perform the task, he could have arranged for someone from NORA to perform it promptly.

(34) Although the evidence could have been viewed in such a way as to justify a different allocation of fault, the responsibility for weighing evidence belongs to the jury. An appellate court's role in reviewing a jury's allocation of fault is very limited. *Id.* We affirm the jury's allocation of fault.

## V. Punitive Damages

(35) The jury rendered a verdict against NORA for punitive damages in the amount of $75,000, approximately 10% of NORA's share of the compensatory damages. NORA argues that the issue of punitive damages should not have been submitted to the jury because (1) Vance did not possess sufficient managerial capacity for his unauthorized conduct to subject NORA to liability for punitive damages and (2) Vance did not *commit* an act but only *failed* to act. We disagree.

(36) To determine whether punitive damages can be assessed against a principal based on the conduct of an agent, New Mexico has adopted the test set forth in Restatement (Second) of Torts § 909(c) (1979) and Restatement (Second) of Agency § 217C(c) (1958). *See Albuquerque Concrete Coring Co. v. Pan Am World Servs.,* 118 N.M. 140, 145, 879 P.2d 772, 777 (1994). Under that test, "[p]unitive damages can properly be awarded against a master or other principal because of an act by an agent if . . . the agent was employed in a managerial capacity and was acting in the scope of employment." *Id.* When an employee acts with such managerial capacity, questions of employer ratification or authorization of the tortious conduct are immaterial. *See id.* at

n. 2. Thus, the first question before us is whether there was sufficient evidence for the jury to find that Vance was acting in a managerial capacity at the time of the incidents leading to the accident.

(37) *Albuquerque Concrete* states that managerial capacity is not dependent on the particular title of the employee or the position in the corporate hierarchy. " 'Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.' " *Id.* at 145, 879 P.2d at 777 (quoting *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 698, 620 P.2d 141, 148 (1979)). A managerial employee is "one who 'formulates, determines and effectuates his employer's policies, one with discretion or authority to make ultimate determinations independent of company consideration and approval of whether a policy should be adopted.' " *Id.* (quoting *Abshire v. Stoller,* 235 Ill.App.3d 849, 176 Ill.Dec. 559, 565, 601 N.E.2d 1257, 1263 (1992)); *accord Rhein v. ADT Automotive,* 122 N.M. 646 ¶ 31, 930 P.2d 783 ¶ 31 (1996). In the present case the jury was instructed, without objection, that "[a] person acts in a managerial capacity when that person has sufficient discretionary or policy-making authority to speak and act independently of higher authority."

(38) NORA argues that the evidence demonstrated that Vance lacked any managerial capacity in relation to line safety, line de-energization, line relocation, and compliance with regulations. But Vance testified that as staff assistant of operations he was one of four employees on the organization chart below general manager Emery Maez. His duties included being NORA's safety coordinator, with responsibility for compliance with laws governing safety and NORA's safety policies. His conduct with respect to the Velardes' project indicated that he was responsible for coordination between NORA, the tribe, the Velardes, and Sun Arrow. Although the evidence here is marginal, we believe that our Supreme Court would hold that the jury could properly find that Vance was acting in a managerial capacity.

(39) We recognize that imposition of punitive damages on NORA may seem harsh, because the burden of paying the award falls on Coop members who certainly had no evil intent. The punitive rationale for punitive damages has no basis here. But punitive damages against corporations are also justified as providing deterrence. *See* Restatement, *supra,* § 909 cmt. b; 2 American Law Institute, *Reporter's Study, Enterprise Responsibility for Personal Injury,* 239–43, 250–51 (1991). Such awards can encourage those with ultimate control of corporations to act to prevent reckless and willful misconduct by management.

(40) As a second argument, NORA contends that punitive damages may not be based solely on omissions, as opposed to acts. It observes that the uniform jury instruction promulgated by our Supreme Court on punitive damages defines both wanton conduct and reckless conduct as the *doing* of an act with the requisite culpable mental state. UJI 13–1827 NMRA 1996. Pointing out that the same instruction defines "gross negligence" in terms of "an act or omission," *id.,* NORA suggests that the absence of the word "omission" in the definitions of "wanton" and "reckless" demonstrates that our Supreme Court intended that omissions never be deemed "wanton" or "reckless."

(41) Although this argument is not without force, we reject it. The difficulty is that conduct can often be construed as either an act or an omission. *See* Keeton et al., *supra,* § 56. In the present case, NORA's failures to act could be characterized as improper distribution of electrical power. *See id.* at 340 (failure to blow a whistle is treated as negligent operation of a train, omission to repair a pipe is regarded as negligent distribution of gas, failure to supply heat can be mismanagement of a boiler). We are particularly influenced by our Supreme Court's opinion in *Clay v. Ferrellgas, Inc.,* 118 N.M. 266, 269, 881 P.2d 11, 14 (1994), *cert. denied,* 513 U.S. 1151, 115 S.Ct. 1102, 130 L.Ed.2d 1069 (1995). The Court affirmed an award of punitive damages when a car exploded because of various errors relating to the conversion of the car to run on propane. After reciting the definition of "reckless" in the uniform jury instructions as "the intentional

doing of an act with utter indifference to the consequences," 118 N.M. at 270, 881 P.2d at 15, the Court summarized the various errors by the defendant and concluded, "[t]he net effect of these omissions was that [defendant's agent] released a vehicle that was dangerously unsafe." *Id.* at 272, 881 P.2d at 17. Thus, the wrongful conduct forming the predicate for punitive damages consisted of omissions, although from a broader perspective the wrong was the improper release of the car. We are confident that our Supreme Court would also characterize the wrongful conduct here as improper supplying of electric power. We therefore reject this contention of NORA.

## VI. Evidence of Insurance

■ (42) NORA's final argument is that the district court erred when it refused to order a new trial after evidence of insurance was introduced at trial. During cross-examination, Plaintiffs' counsel asked Emery Maez, NORA's general manager, whether he had submitted an investigative report. After Maez answered affirmatively, counsel asked him to identify a document. Maez responded that it was the "standard form from our insurance carrier." NORA moved for a mistrial. The court ruled that a mistrial was not warranted because the witness had volunteered the information.

■ (43) Whether or not to grant a mistrial is left to the discretion of the trial court, and the court's decision will be overturned only if there was an abuse of that discretion. *See Martinez v. Ponderosa Prods.*, 108 N.M. 385, 386, 772 P.2d 1308, 1309 (Ct.App.1988), *cert. denied*, 108 N.M. 273, 771 P.2d 981 (1989). It is true that "[a] mistrial will generally be declared in a negligence action if the question of insurance is brought into the case in such a manner as to be calculated to influence the verdict of the jury." *Falkner v. Martin*, 74 N.M. 159, 162, 391 P.2d 660, 664 (1964). But the district court found no such calculation here. Plaintiffs' counsel had listed the document as an exhibit, the document was labeled as a NORA investigative report, and Plaintiffs' counsel asserted that he was not looking for the response that the witness gave. As general manager of NORA, the witness was unlikely to be under the influence of Plaintiffs' counsel. "The rule appears to be uniform that if a lawyer propounds a question which calls for proper evidence, the fact that an irresponsive or inadvertent answer includes a reference to insurance will not be grounds for declaring a mistrial." *Cardoza v. Town of Silver City*, 96 N.M. 130, 137, 628 P.2d 1126, 1133 (Ct.App.), *cert. denied*, 96 N.M. 116, 628 P.2d 686 (1981). Under these circumstances we cannot say that the district court abused its discretion in refusing to grant a mistrial.

## VII. Cross–Appeal: Prejudgment Interest

■ (44) Plaintiffs cross-appeal the district court's denial of prejudgment interest. The pertinent statutory provision states:

> The court in its discretion may allow interest of up to ten percent from the date the complaint is served upon the defendant after considering among other things:
>
> (1) if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and
>
> (2) if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff.

NMSA 1978, § 56–8–4(B) (Repl.Pamp.1996). Whether to award prejudgment interest is a decision left to the sound discretion of the trial court, *id.*, and we will reverse only for an abuse of that discretion. *See Gonzales v. Surgidev Corp.*, 120 N.M. 133, 150, 899 P.2d 576, 593 (1995); *Lucero v. Aladdin Beauty Colleges*, 117 N.M. 269, 272, 871 P.2d 365, 368 (1994).

■ (45) Plaintiffs argue that because they were not the cause of unreasonable delay, and because no reasonable and timely offer of settlement was made, it was an abuse of discretion for the court to refuse to award prejudgment interest. We disagree. The district court ruled that an award of prejudgment interest would not further the purpose of the statute, which is to encourage settlement and prevent delay. *Lucero*, 117 N.M. at 272, 871 P.2d at 368. It determined that NORA had not been the source of unreason-

able delay and that there were difficult legal issues to be decided which would probably preclude settlement and were worthy of full briefing and argument. The district court's ruling is not without logic. The cross-appeal is denied.

CONCLUSION

(46) The judgment is modified to the extent that NORA is not jointly and severally liable for the apportioned fault of Mr. Velarde, but it is affirmed in all other respects.

(47) **IT IS SO ORDERED.**

BOSSON and WECHSLER, JJ., concur.

*ON REHEARING*

HARTZ, Chief Judge.

■ (48) Our original opinion in this case was filed on January 7, 1997. On March 19, 1997 we granted NORA's motion for rehearing on its contention that the jury should have been instructed with respect to the comparative fault of Jolene Velarde. While that matter was pending, the parties notified the Court that they had resolved their dispute. Consequently, we dismiss the appeal and remand to the district court to conduct proceedings necessary to effectuate the settlement.

■ (49) The question arises whether our previously filed opinion, which we had directed to be published, should be published for its precedential value alone. *See First Nat'l Bank in Albuquerque v. Sanchez*, 112 N.M. 317, 326, 815 P.2d 613, 622 (1991) (parties advised court of settlement while opinion was being prepared in final form for filing; appeal dismissed but opinion published); *Riesenecker v. Arkansas Best Freight Sys.*, 110 N.M. 451, 453, 796 P.2d 1147, 1149 (Ct. App.1990) (before opinion was filed, parties had settled without notifying court); *Stewart v. Southern Ry. Co.*, 315 U.S. 283, 62 S.Ct. 616, 86 L.Ed. 849, *judgment vacated*, 315 U.S. 784, 62 S.Ct. 801, 86 L.Ed. 1190 (1942) (on petition for rehearing it appeared that case had settled). We decide that the opinion should be published, at least in part. Our opinion can have precedential effect, because it was rendered while the case was within our jurisdiction. *See In re Smith*, 964 F.2d 636,

638 (7th Cir.1992). The opinion issued after full briefing and thorough consideration by this panel. The provision of precedent is a matter of public interest, not just a concern of the parties to the litigation. Even when the parties to the appeal agree that an opinion should not be published, the court need not oblige. *See Oklahoma Radio Assocs. v. FDIC*, 3 F.3d 1436 (10th Cir.1993); *cf. United States Bancorp. Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994) (settlement by parties while case is pending after grant of certiorari does not require Supreme Court to vacate lower court judgment).

(50) We note, however, that full publication is not appropriate. On this appeal we were sufficiently concerned about one issue addressed in the opinion that we granted a motion for rehearing on that issue. We believe it appropriate not to publish the portion of the original opinion addressing that issue. Accordingly, we order publication of our original opinion, except for the discussion of failure to instruct with respect to the comparative fault of Mrs. Velarde.

(51) **IT IS SO ORDERED.**

BOSSON and WECHSLER, JJ., concur.