2003-NMCA-091

73 P.3d 827

**W.C. McELHANNON and Patricia McElhannon, Plaintiffs–Appellants,**

v.

**Rick FORD and Freida Kae Ford, individually; Rick Ford d/b/a Rick Ford Welding and Construction; Don Holland d/b/a Don's Air Conditioning and Electric; Roger Huntley, electrical contractor, license no. 18992; Town of Clayton, a New Mexico municipality; and Public Service Company of New Mexico, a New Mexico corporation, Defendants–Appellees.**

No. 22,547.

Court of Appeals of New Mexico.

May 16, 2003.

Michael L. Gregory, Las Vegas, NM, for Appellants.

Robert O. Beck, Beck & Cooper, Clayton, NM, for Appellees–Fords.

Gary D. Alsup, Alsup Law Office, Clayton, NM for Appellee–Holland.

Thomas C. Bird, S. Charles Archuleta, Keleher & McLeod, P.A., Albuquerque, NM, for Appellee–Public Service Company of New Mexico.

## OPINION

ALARID, Judge.

{1} This case requires us to decide if summary judgment was properly entered against the purchasers of a new home who sued a seller-general contractor for failure to disclose that the home was built without permits required by the Construction Industries Licensing Act (CILA), NMSA 1978, §§ 60–13–1 to –58 (1967, as amended through 2001). We also address the entry of summary judgment in favor of the subcontractor who allegedly proceeded with construction in the absence of permits required by the CILA. Finally, we address the liability of a public utility company to the purchasers for alleged negligence in complying with requirements imposed on utilities by the CILA.

## BACKGROUND

{2} Defendant–Appellee, Rick Ford, is a licensed New Mexico general contractor. In January 1996, Ford applied for a general construction permit for a residence to be constructed at 18 Jenkins Road, Clayton, New Mexico. The application and proposed plans indicated that the home was to be constructed using steel framing. Construction Industries Division (CID) rejected the application, citing a policy requiring plans for metal-framed buildings to be reviewed and stamped by a licensed mechanical engineer. Defendants–Appellees, Ford and his wife, Freida Kae Ford (Fords), decided to build the home without obtaining a general construction permit from CID. The Fords hired Defendant–Appellee, Don Holland (Holland), a licensed electrical and mechanical contractor, to install the electrical system. Defendant–Appellee, Public Service Company of New Mexico (PNM), provided electricity and gas to the home.

{3} After the home was completed, the Fords put it on the market, knowing that CID had not issued a permit to erect a steel frame structure and that CID had not issued a certificate of occupancy for the home. In May 1997, Plaintiffs–Appellants, W.C. and Patricia McElhannon (McElhannons), and the Fords entered into a purchase agreement for the home. The purchase agreement recited that the McElhannons were purchasing the home

upon PURCHASER(S) own examination and judgment and not by reason of any representation made to PURCHASER(S) by SELLER(S) or agent for SELLER(S) as to its condition, size, location, value, future value, income therefrom or as to its production. PURCHASER(S) further accept(s) property in present condition including but not limited to, roof, all plumbing, electrical and all mechanical equipment.

{4} Because the McElhannons financed the purchase through the Veteran's Administration, federal law, 38 U.S.C. § 3705 (1991), required that the purchase agreement include a one-year warranty. The purchase agreement included the following provision:

The dwelling located on the property identified above is constructed in substantial conformity with the plans and specifications (including any amendments, thereof, or changes and variations therein) which have been approved in writing by ... the Secretary of Veterans Affairs on which the ... Secretary or Veterans Affairs based the valuation of the dwelling. However, this warranty shall apply to such instances of substantial nonconformity to which the Purchaser(s)/Owner(s) or his or her (their) successors or transferees shall have given written notice to the Warrantor within 1 year from the date of original

conveyance of title to such Purchaser(s)/Owner(s)....

....

This warranty shall be in addition to, and not in derogation of, all other rights and privileges which such Purchaser(s)/Owner(s) may have under any other law or instrument[.]

{5} The McElhannons occupied the home in July 1996. They noticed a number of defects, including problems with the foundation. In the course of investigating the construction of the home, the McElhannons discovered that CID had no record of the issuance of a general construction permit or a certificate of occupancy for the home.

{6} In October 1999, the McElhannons filed suit against the Fords, Holland, and PNM. The complaint asserted claims for fraud, negligent misrepresentation, breach of warranty, rescission, and unfair trade practices. Following discovery, the Defendants moved for summary judgment. The trial court granted summary judgment in favor of Defendants and against the McElhannons with the sole exception of the McElhannons' breach of warranty claim against the Fords. Pursuant to Rule 1–054(B)(1) NMRA 2003, the trial court expressly determined that there was no just reason for delay in entering final judgment on the grant of partial summary judgment against the Fords. The McElhannons filed a timely notice of appeal.

## DISCUSSION

1. *Summary Judgment in Favor of the Fords*

   a. **Fraud by Affirmative Representation**

■ {7} In the trial court, the Fords argued there was no factual basis for the McElhannons' fraud claim because there was no evidence that the Fords affirmatively misrepresented any facts about the home. The Fords' assertion that the record contained no evidence of an affirmative misrepresentation by the Fords was sufficient to make out a prima facie case of entitlement to summary judgment. *See Blauwkamp v. Univ. of N.M. Hosp.*, 114 N.M. 228, 232, 836 P.2d 1249, 1253 (Ct.App.1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting); for proposition that summary judgment is appropriate where movant shows that nonmoving plaintiff's evidence is insufficient to establish an essential element of the plaintiff's case; recognizing that defendant need not affirmatively disprove plaintiff's claim to demonstrate prima facie case of entitlement to summary judgment). In response, the McElhannons argued that the Fords made an affirmative misrepresentation of fact when they warranted in the purchase agreement that the home was constructed in accordance with approved plans and specifications. A dispositive flaw in the McElhannons' argument is that the warranty clearly refers to approval by the Secretary of Veteran Affairs, not to approval by CID. Thus, the warranty in the purchase agreement was not rendered false by the fact that the Fords had not obtained CID approval of the plans. The McElhannons failed to establish a genuine issue of material fact as to whether the Fords made an affirmative misrepresentation. Accordingly, summary judgment on the McElhannons' claim of fraud by affirmative misrepresentation is affirmed.

   b. **Fraudulent Nondisclosure**

■ {8} The Fords' motion for summary judgment did not address fraud by nondisclosure, even though this theory of fraud clearly is recognized in New Mexico, *Krupiak v. Payton*, 90 N.M. 252, 561 P.2d 1345 (1977), and was pleaded in the McElhannons' complaint. In their response, the McElhannons argued that the Fords had a duty to disclose the facts that the home had been constructed without compliance with the permit requirements of the CILA and CID regulations, and that the Fords' nondisclosure amounted to fraud.

{9} By completely ignoring the McElhannons' fraudulent nondisclosure claim, the Fords failed to satisfy their initial burden of establishing a prima facie case of entitlement to summary judgment on the McElhannons' fraudulent nondisclosure claim. *See Bartlett v. Mirabal*, 2000–NMCA–036, ¶ 17, 128 N.M. 830, 999 P.2d 1062. Accordingly, the trial court should have denied the Fords' motion for summary judgment as to this claim.

### c. Negligent Nondisclosure

■ {10} The McElhannons' negligent nondisclosure claim is more problematic. New Mexico law on negligent misrepresentation follows Section 552 of the Restatement (Second) of Torts (1977) [hereinafter Restatement Torts]. *First Interstate Bank v. Foutz,* 107 N.M. 749, 751, 764 P.2d 1307, 1309 (1988). It is not at all clear to us that Section 552 contemplates a cause of action for negligent *nondisclosure. See* UJI 13–1632 NMRA 2003, committee cmt. (noting unsettled state of law as to liability for negligent nondisclosure). On its face, Section 552 appears to apply only to affirmative misrepresentations. Although we previously acknowledged the tort of negligent misrepresentation by nondisclosure, we did so without carefully distinguishing fraudulent and negligent nondisclosure. *R.A. Peck, Inc. v. Liberty Fed. Sav. Bank,* 108 N.M. 84, 88, 766 P.2d 928, 932 (Ct.App.1988).

{11} Section 552 is contained in Chapter 22, Topic 3, of the Restatement Torts, whereas Section 551, which sets out the Restatement Torts' rules governing liability for nondisclosure, is contained in Chapter 22, Topic 2. The comments and illustrations to Section 551 assume that nondisclosure under the circumstances set out in Section 551 gives rise to an action in deceit—i.e., fraudulent misrepresentation, not negligence.

■ {12} A party can be held liable for nondisclosure only when there is a duty to disclose. *R.A. Peck,* 108 N.M. at 88, 766 P.2d at 932; Restatement Torts § 551(1). Section 551(2)(e) imposes on a party to an arm's-length business transaction a duty to disclose

> facts basic to the transaction, if he *knows* that the other is about to enter into it under a mistake as to them, and [*knows*] that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

(Emphasis added.) Section 551(2)(e) is consistent with New Mexico case law.

> Generally speaking, ... in the conduct of various transactions between persons involving business dealings, ... there are times and occasions when the law imposes upon a party a duty to speak rather than to remain silent in respect to certain facts *within his knowledge* and thus to disclose information, in order that the party with whom he is dealing may be placed on an equal footing with him....
>
> *Knowledge* that the other party to a contemplated transaction is acting under a mistaken belief as to certain facts is a factor in determining that a duty of disclosure is owing.

*Everett v. Gilliland,* 47 N.M. 269, 275–76, 141 P.2d 326, 330 (1943) (emphasis added, internal quotation marks and citations omitted).

■ {13} As we understand Section 551(2)(e) and *Everett,* in an arm's-length transaction a duty to disclose arises only when the defendant has *actual knowledge* of both the undisclosed information and the fact that the plaintiff is proceeding in ignorance of facts basic to the transaction; it is not enough to show that the defendant should have known the information or its importance to the plaintiff. However, *knowing* nondisclosure—the state of mind required to render nondisclosure fraudulent in an arm's-length business transaction—is inherently inconsistent with a cause of action based on negligence. *See Ledbetter v. Webb,* 103 N.M. 597, 602, 711 P.2d 874, 879 (1985) (holding that affirmative misrepresentation made with actual knowledge of its falsity cannot, as a matter of law, constitute negligent misrepresentation).

■ {14} In the present case, we are concerned with an arm's-length business transaction. There are no allegations of a fiduciary or confidential relationship between the parties. The sole basis for the McElhannons' assertion of a duty to disclose is the Fords' actual knowledge of facts that were not reasonably discoverable by the McElhannons. We may affirm a trial court on an alternate ground where it has reached the correct result and where reliance on the alternate ground will not be unfair to the appellant. *In re Estates of Brown,* 2000–NMCA–030, ¶ 18, 128 N.M. 825, 999 P.2d 1057. Applying *Ledbetter,* we hold that the McElhannons' claim *for damages* for nondisclosure sounds solely in de-

ceit, and accordingly, we affirm the grant of summary judgment on the McElhannons' claim for damages for negligent nondisclosure. 103 N.M. at 602, 711 P.2d at 879.

#### d. Rescission

{15} The Fords argue that the grant of summary judgment on the McElhannons' rescission claim was proper in view of the recital in the purchase agreement that the McElhannons were purchasing the home "upon [their] own examination and judgment and not by reason of any representation made to [them] by [the Fords]." As explained above, we have reinstated the McElhannons' claim that the Fords fraudulently withheld information from the McElhannons. Contractual disclaimers such as that relied upon by the Fords do not relieve a party from liability for fraud. *Gouveia v. Citicorp Person–to–Person Fin. Ctr. Inc.*, 101 N.M. 572, 578, 686 P.2d 262, 268 (Ct.App.1984). Further, rescission may be allowed in certain cases of non-fraudulent, but material, nondisclosure. *See* Restatement (Second) of Contracts § 161, cmt. b (stating that unintentional nondisclosure of a known fact may justify rescission to same extent as affirmative innocent misrepresentation), § 164(1), cmt. b (1981) (recognizing that representation need not be fraudulent in order to render avoidable a contract induced by material misrepresentation). We therefore reverse the grant of summary judgment as to the rescission count.

#### e. Unfair Practices Act

{16} The Fords argue that the trial court properly dismissed the McElhannons' claim under the Unfair Practices Act (UPA), NMSA 1978, Sections 57–12–1 to –22 (1967, as amended through 1999), because the UPA does not apply to sales of real estate. We agree. For a defendant's conduct to constitute an "unfair or deceptive trade practice" with respect to a sale, the transaction must involve "goods or services." Section 57–12–2(D). We give statutory language "its ordinary and plain meaning" unless the Legislature has clearly indicated otherwise. *Cooper v. Chevron U.S.A., Inc.*, 2002–NMSC–020, ¶ 16, 132 N.M. 382, 49 P.3d 61.

{17} The word "goods" "is generally understood to mean personal estate *as distinguished from realty.*" XX Cyclopedia of Law and Procedure, *Goods* 1262 (Wm.Mack, editor-in-chief, 1906) (Cyclopedia of Law) (emphasis added). The word "services" is generally understood to mean "work done by one person at the request of another." XXXV Cyclopedia of Law, *Services* 1434; *cf.* NMSA 1978, § 7–9–3(K) (2002) (defining "services" as "all activities engaged in for other persons for a consideration"). To the extent goods and services are combined to create a structure that is permanently affixed to realty, they are understood to have been "converted" to realty. *See* 73 C.J.S. *Property* § 23, at 203 (1983). We are persuaded that in ordinary usage a completed house, as a form of realty, cannot be "goods." As tangible property, a house cannot constitute "services." We are unable to find any compelling reason elsewhere in the UPA for applying any meaning other than the ordinary meaning of goods and services. We therefore hold that a sale of a completed house is not a sale of goods or services for purposes of Section 57–12–2(D). Accordingly, we affirm the trial court's grant of summary judgment on the McElhannons' UPA claim.

{18} To summarize, we reverse the summary judgment as to the McElhannons' fraudulent nondisclosure and rescission claims. We affirm the grant of summary judgment as to the McElhannons' fraud by affirmative representation, negligent nondisclosure and UPA claims.

#### 2. *Summary Judgment in Favor of Holland*

##### a. Breach of Warranty

{19} The McElhannons argue that they should be allowed to assert breach of warranty claims against Holland as third-party beneficiaries of Holland's contract with the Fords. According to the McElhannons, Holland impliedly warranted to the Fords that he performed his work in accordance with the CILA and applicable CID regulations. The McElhannons overlook *Tarin's, Inc. v. Tinley*, 2000–NMCA–048, ¶¶ 14–15,

129 N.M. 185, 3 P.3d 680, where we recognized that a property owner is presumptively *not* an intended beneficiary of a subcontractor's contract with a general contractor. We recognized in *Tinley* that a proper evidentiary showing conceivably could overcome the presumption that a property owner is not the intended beneficiary of contracts between the general contractor and its subcontractors. *Id.* The McElhannons did not come forward with any evidence that would overcome the *Tinley* presumption. We hold that the McElhannons failed to establish a genuine issue of material fact as to their status as third-party beneficiaries of the implied warranties in the Fords' subcontracts with Holland. Accordingly, the trial court properly granted summary judgment on the McElhannons' breach of warranty claim against Holland.

### b. Negligence

{20} Citing *Steinberg v. Coda Roberson Const. Co.*, 79 N.M. 123, 440 P.2d 798 (1968), the McElhannons argue that they have standing to sue Holland in negligence for violating the CILA and CID regulations. In *Steinberg,* our Supreme Court held that the absence of privity of contract between the plaintiff homeowner and the defendant roofing contractor did not preclude the homeowner from suing the contractor for negligence. *Id.* at 124, 440 P.2d at 799. Our Supreme Court held that subsequent purchasers are in the class of persons foreseeably to be injured by defects in the construction of a home. *Id.* at 124–25, 440 P.2d at 799–800.

{21} The record demonstrates that CID issued Holland several blank application/permit forms for electrical work. In addition to a white original, these forms incorporate multiple carbon copies, including canary, blue, pink, and goldenrod. According to directions printed on the form, the white original is to be submitted to CID upon payment of the appropriate fee, the canary, blue, and pink copies are to be delivered to the building inspector's pick up site, and the goldenrod copy is for the contractor's own records. During the course of this lawsuit, Holland produced a document certified by the New

Mexico Regulation and Licensing Department as a true and correct copy of the permit for work performed at 18 Jenkins Road as maintained in the Regulation and Licensing Department's records. The permit is signed by Holland and dated February 15, 1996. It states that the location for inspections is 18 Jenkins Road, Clayton, New Mexico. At the bottom of the permit, in a space marked "Inspector Use Only," are various notations, including notations that building inspector Bert Lloyd conducted a first inspection on February 29, 1996, an initial inspection on March 27, 1966, re-inspections on June 12 and 19, 1996, and a final inspection on July 10, 1996. Holland testified that he specifically recalled seeing Lloyd at 18 Jenkins Road when the electrical wiring was roughed-in, on another occasion before the installation and sheet rock were installed, and a final occasion after the electrical work was completed and ready for final inspection. Although Lloyd did not have a specific recollection of inspecting 18 Jenkins Road, he testified that the notations on the permit referring to inspections were in his handwriting. Lloyd testified that he was "positive" that consistent with his usual practices he had conducted all of the inspections indicated on the permit.

{22} In response to Holland's showing in support of his motion for summary judgment, the McElhannons relied on three principal facts. First, a copy of the permit obtained by the McElhannons from CID's records did not contain the notations in Lloyd's handwriting found on the copy obtained by Holland. Second, Justin Keeth, a helper employed by Holland, testified that he was present throughout the wiring and that he did not remember seeing a building inspector. Third, a thorough inspection of the home by an expert retained for purposes of this litigation discovered a few minor violations of the building code in the crawl space and attic of the home.

{23} Holland's showing was sufficient to make out a prima facie case of entitlement to summary judgment. *See Bartlett,* 2000–NMCA–036, ¶17, 128 N.M. 830, 999 P.2d 1062. The burden of production then shifted to the McElhannons to come forward with sufficient evidence to permit a rational fact-

finder to return a verdict in their favor. *See Goradia v. Hahn Co.*, 111 N.M. 779, 782, 810 P.2d 798, 801 (1991).

{24} We are unable to draw an inference favorable to the McElhannons from the fact that CID maintains a copy of the electrical permit that does not have the inspector's notations. CID regulations contemplate that the permit will be obtained before work is begun. 14.5.2.8.B.(1)(c) NMAC (2003) (authorizing assessment of double fee where work is begun prior to acquiring necessary permit). We therefore would expect that the copy of the permit form completed by Holland and forwarded to CID with payment of the permit fee would not reflect any inspections, while the copy completed by the inspector would reflect the subsequent inspections.

{25} The testimony of Justin Keeth, while consistent with the McElhannons' theory of the case, nevertheless falls short of the proof required to permit a fair-minded factfinder to return a verdict in the McElhannons' favor. Most significantly, as Holland points out, there was no testimony that Keeth could identify Lloyd.

{26} We believe the evidence of minor electrical code violations discovered by the expert retained for purposes of this litigation to be essentially neutral. The McElhannons would have us draw the inferences that if an inspection had occurred, these minor violations would have been discovered and that since they were not discovered, we must infer that no inspections occurred. However, the record contains no evidence indicating that a typical inspection would be expected to pick up every minor building code violation.

{27} On the evidence marshaled by the McElhannons in opposition to Holland's motion for summary judgment, a verdict in the McElhannons' favor would have amounted to speculation. We therefore hold that the McElhannons failed to come forward with evidence that would have allowed a rational jury to find in their favor on the issue of whether Holland obtained an electrical permit. We therefore affirm the grant of summary judgment in favor of Holland.

### c. Motion to Amend

{28} Prior to the hearing on Holland's motion for summary judgment and within the time limits provided in the trial court's scheduling order, the McElhannons moved for leave to file an amended complaint asserting for the first time that Holland had failed to obtain a permit for certain mechanical work. The trial court did not rule on the McElhannons' motion to amend prior to the ruling on Holland's motion for summary judgment. The McElhannons briefed the issue in their response to Holland's motion for summary judgment At the hearing on the motions for summary judgment, the McElhannons argued the issue of the lack of a mechanical permit and reminded the trial court of their pending motion to amend their complaint.

{29} The McElhannons exercised reasonable diligence in bringing the issue of the mechanical permit before the trial court. We conclude that the proper course is to remand for consideration of the McElhannons' motion to amend. We therefore conditionally affirm the grant of summary judgment in Holland's favor. If the trial court grants the motion to amend, then the McElhannons may proceed on their claim that Holland failed to obtain a mechanical permit.

### 3. *Summary Judgment in Favor of PNM*

{30} The McElhannons argue that PNM connected gas and electrical supplies to the home without complying with the CILA and CID regulations and that PNM is liable under a theory of negligence per se. *See Abeita v. N. Rio Arriba Elec. Coop.*, 1997–NMCA–097, ¶ 20, 124 N.M. 97, 946 P.2d 1108. The McElhannons' claim against PNM relies on the theory that "[h]ad utility services not been available, the ... Ford[s] would have certainly been unable to sell the dwelling house to [the McElhannons], and [the McElhannons], in turn, would not have experienced the damages that gave rise to this litigation." The McElhannons do not claim that PNM's alleged breaches of duties imposed by the CILA or CID regulations resulted in physical harm to themselves or to their property.

{31} The CILA contains the following provision regulating the connection of utilities:

A. . . . [N]o public utility shall make a connection from a supply of water or gas to an installation for which a permit is required, or which has been disconnected or ordered to be disconnected by the trade bureau having jurisdiction, without the authorization of the trade bureau having jurisdiction.

B. The public utility may make a connection from a supply of water or gas to an installation under the following circumstances:

. . . .

(2) if an installation or work is not located in any territory where there is an authorized inspector; provided, however, before any such connection is made by the public utility, the public utility must have received a written statement from the licensee declaring that the installation or work conforms with the provisions of the Construction Industries Licensing Act [this article] and the orders, rules and regulations, codes and minimum standards made pursuant to that act. The public utility shall immediately report to the proper trade bureau the receipt and contents of the statement. If it is discovered by the trade bureau that the declaration made in the statement is false, the trade bureau shall order the licensee making the statement to rectify the defects within five days after receipt of the written notice thereof from the bureau.

C. No public or municipally owned electric utility shall make a connection from a supply of electricity for which a permit is required without the approval of the electrical bureau or its authorized representative.

Section 60–13–47.

■ {32} We apply the following test for determining whether a defendant may be held liable under a negligence-per-se theory:

(1) [T]here must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent.

*Abeita,* 1997–NMCA–097, ¶ 20, 124 N.M. 97, 946 P.2d 1108 (quoting *Archibeque v. Homrich,* 88 N.M. 527, 532, 543 P.2d 820, 825 (1975)). We view Section 60–13–47 as a health and safety measure. We hold that the indirect and purely economic harm suffered by the McElhannons is not the type of harm that the Legislature sought to prevent in enacting Section 60–13–47. We affirm the summary judgment in favor of PNM.

## CONCLUSION

{33} We affirm the trial court's grant of summary judgment on the McElhannons' fraud by affirmative representation, negligent nondisclosure, and UPA claims against the Fords. We reverse the summary judgment on the McElhannons' fraudulent nondisclosure and rescission claims. We conditionally affirm the dismissal of the McElhannons' claims against Holland. However, we remand for consideration of the McElhannons' motion to amend their complaint against Holland. We affirm the grant of summary judgment on the McElhannons' claim against PNM.

{34} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN and CELIA FOY CASTILLO, Judges.